In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 14-3327 and 14-3344

MARY NELL WYATT, individually and as Executrix of the Estate of RONALD E. WYATT, et al.,

*Plaintiffs-Appellants,*

*v.*

SYRIAN ARAB REPUBLIC, et al.,

*Defendants,*

*and*

FRANCIS GATES, et al.,

*Third-Party Defendants-Appellees.*

_____

FRANCIS GATES, et al.,

*Plaintiffs-Appellees,*

*v.*

SYRIAN ARAB REPUBLIC, et al.,

*Defendant,*

*v.*

MARY NELL WYATT, et al.,

*Claimants-Appellants.*

————————————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division
Nos. 11 C 8715 and 14 C 6161 — **Virginia M. Kendall**, *Judge*.

————————————————

ARGUED MAY 20, 2015 — DECIDED AUGUST 31, 2015

————————————————

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. These appeals address attempts to execute final judgments against the nation of Syria obtained by two groups of United States victims of Syrian state-sponsored terrorism. Both groups of victims have won judgments under the Foreign Sovereign Immunities Act. Both seek to satisfy their judgments by seizing the same Syrian assets located in the Northern District of Illinois.

We affirm the actions of the district court, which ordered the assets disbursed to the appellees, whom we refer to as the Gates plaintiffs. The legal issue we decide on the merits is that plaintiffs who win judgments in state-sponsored terrorism cases against foreign governments under 28 U.S.C. § 1605A, and who seek to attach property under § 1610(g), are not required to comply with the notice requirement of § 1608(e) before executing their judgments. The Foreign Sovereign Immunities Act contains extensive procedural protections for foreign sovereigns in United States courts, but Congress has amended the Act to cut back some of those protections in cases of state-sponsored terrorism. Before dealing with the merits of this issue at the end of this opinion, how-

ever, we must first deal with a complex procedural history and several jurisdictional challenges.

To explain, we begin by introducing the legal framework for remedies for state-sponsored terrorism under the Foreign Sovereign Immunities Act, the parties and their claims, and the involved procedural history of these appeals. We then address challenges to our jurisdiction and conclude by addressing the merits of these appeals.

I.  *Legal, Factual, and Procedural Background*

A.  *Terrorism and the Foreign Sovereign Immunities Act*

The default rule of United States law is that foreign states are immune from suit and attachment of assets in United States courts, but the Foreign Sovereign Immunities Act (FSIA) provides a number of exceptions and special procedures for such cases. The FSIA is comprehensive, so all cases against foreign sovereigns must be fitted into its statutory framework. *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. —, 134 S. Ct. 2250, 2255–56 (2014); *Gates v. Syrian Arab Republic*, 755 F.3d 568, 571 (7th Cir. 2014) (earlier appeal involving same Syrian assets at issues in these appeals).

The FSIA now contains provisions specific to claims for state-sponsored terrorism. Section 1605A removes sovereign immunity in actions for money damages for personal injury or death resulting from an act of state-sponsored terrorism. 28 U.S.C. § 1605A. Once plaintiffs obtain a judgment under § 1605A, they may proceed to attach assets to execute that judgment under § 1610. Subsection § 1610(g) allows plaintiffs with a judgment against a state sponsor of terrorism to attach and execute the judgment against property of the for-

eign state itself and any agency and instrumentality of the state.

Other provisions of § 1610 establish the more general process for executing a judgment against a foreign state in suits other than those for state-sponsored terrorism, such as more ordinary contract or tort cases arising out of a foreign state's commercial activities. Subsections 1610(a) and (b) describe the property of foreign states that is generally subject to attachment to satisfy a judgment. Subsection 1610(c) delays attachment and execution under § 1610(a) and (b) until a court determines that a reasonable period of time has elapsed following the entry of judgment. Subsection 1610(c) also requires compliance with § 1608(e), which directs a plaintiff who obtains a default judgment to serve the foreign state with a copy of the judgment in a specific manner.

The interplay of these more general provisions and the special provisions for state-sponsored terrorism are at the center of the dispute between these two groups of victims. In *Gates*, we described the perhaps unintended consequences of this statutory scheme in previous appeals by a third group of victims seeking the same assets in dispute here:

> [T]he FSIA does not provide a mechanism for distributing equitably among different victims any Syrian assets in the United States that are subject to attachment. Instead, victims who finally obtain judgments must then engage in the costly, burdensome, and often fruitless task of searching for available assets.

> These victims of terror can then find themselves pitted in a cruel race against each oth-

er—a race to attach any available assets to satisfy the judgments. The terms of the race are essentially winner-take-all rather than any equitable sharing among victims of similar losses. Under the FSIA's compensation scheme, a terrorism judgment against Syria can be satisfied only at the expense of other terrorism victims.

*Gates*, 755 F.3d at 571.

B. *The Gates Plaintiffs*

In both of these appeals, the appellees are the Gates plaintiffs. They are defending the district court's decision to release confiscated Syrian funds to them to satisfy their judgment. The Gates plaintiffs are relatives of Olin Eugene "Jack" Armstrong and Jack L. Hensley. Hensley and Armstrong were kidnapped in September 2004 by al-Qaeda when the two men were working as contractors in Iraq for the U.S. military. They were gruesomely murdered, and the killings were captured on a video that was made public by al-Qaeda. The Gates plaintiffs sued Syria under the FSIA for sponsoring al-Qaeda's terrorism. (Syria has been on the list of state sponsors of terrorism since the list was created in 1979.)

On September 26, 2008, the Gates plaintiffs obtained a default judgment in the United States District Court for the District of Columbia for $413 million against Syria. A month later, on October 23, the court clerk sent a copy of the default judgment to the Syrian Foreign Ministry via a private delivery service, but the delivery was rejected and the delivery agent was told "the shipment is no longer required." The

next day, Syria filed a notice of appeal challenging the district court's personal jurisdiction over Syria.

While that appeal was pending, the Gates plaintiffs sought to take steps to execute their judgment against Syria. The Wyatt plaintiffs, who had filed their own suit against Syria, moved to intervene in the Gates case in the District of Columbia, asserting a prior claim on Syrian assets in the District of Columbia because they had filed their suit earlier. The district court stayed enforcement of the *Gates* judgment pending appeal and denied as moot the Wyatt motion to intervene.

On May 20, 2011, the United States Court of Appeals for the District of Columbia Circuit found personal jurisdiction proper and affirmed the district court's default judgment in favor of the Gates plaintiffs. *Gates v. Syrian Arab Republic*, 646 F.3d 1, 5 (D.C. Cir. 2011). The Gates plaintiffs then filed a motion in the District of Columbia district court for a § 1610(c) order authorizing them to enforce their judgment because a "reasonable time" had passed after entry of judgment and notice to Syria. 28 U.S.C. § 1610(c). The district court agreed that § 1610(c) had been satisfied and authorized the Gates plaintiffs to proceed to attachment and execution of the judgment.

C. *The Wyatt Plaintiffs*

In both of the current appeals, the appellants are the Wyatt plaintiffs. They are also victims of terrorism sponsored by Syria. They are the relatives of Ronald Wyatt and Marvin T. Wilson, two biblical archaeologists who were captured in Turkey in August 1991 by armed members of the Kurdistan Workers' Party (PKK), a militant Kurdish organization. The

two men were held in captivity for 21 days under harsh conditions and in constant fear for their lives. The Wyatt plaintiffs sued the Syrian government for sponsoring PKK terrorism.

Over a year after the District of Columbia Circuit affirmed the *Gates* judgment, the Wyatt plaintiffs obtained on December 17, 2012 a default judgment against Syria in the United States District Court for the District of Columbia for $338 million. The district court ordered the Wyatt plaintiffs to serve a copy of the default judgment on Syria pursuant to 28 U.S.C. § 1608(e). Syria appealed the judgment, and the Wyatt plaintiffs cross-appealed, arguing that service under 28 U.S.C. § 1608(e) was unnecessary because Syria had participated actively in the litigation and obviously knew of the default judgment. On January 30, 2014, the United States Court of Appeals for the District of Columbia Circuit affirmed the judgment against Syria and rejected the Wyatt plaintiffs' cross-appeal, holding that § 1608(e) is a "clear and unambiguous statute" that required service of the default judgment. *Wyatt v. Syrian Arab Republic*, 554 Fed. App'x 16, 17 (D.C. Cir. 2014) (mem).

To comply with 28 U.S.C. § 1608(e), the Wyatt plaintiffs then served a copy of the judgment on the Syrian government, which had already appealed the same judgment. The Wyatt plaintiffs then sought a § 1610(c) order from the District of Columbia district court to authorize them to enforce their judgment because a "reasonable time" had passed. On May 19, 2014, that court ruled that the Wyatt plaintiffs had complied with § 1610(c) and authorized them to proceed to attachment and execution of the judgment.

D. *The Northern District of Illinois Litigation*

In the meantime, however, while the Wyatt plaintiffs had still been seeking a final judgment and § 1610(c) order in the District of Columbia, the Gates plaintiffs had taken steps to execute their judgment against Syrian assets. They subpoenaed the Office of Foreign Assets Control in the U.S. Treasury Department to identify Syrian assets in the United States that could be attached to satisfy their judgment. The Office responded under a protective order and told the Gates plaintiffs that some Syrian assets were located in the Northern District of Illinois.

1. *Procedural History of Appeal No. 14-3344*

The Gates plaintiffs registered their judgment from the District of Columbia action with the district court in the Northern District of Illinois as case No. 11-cv-8715 and served a citation to discover assets on JP Morgan Chase Bank. The bank identified responsive accounts belonging to agencies and instrumentalities of Syria that were held by the bank itself and by AT&T. See 28 U.S.C. § 1610(g) (authorizing the attachment of and execution of a judgment against "the property of an agency or instrumentality" of a state liable for sponsoring terrorism). The Gates plaintiffs responded by serving AT&T with a citation to discover assets and pursued other responsive accounts at JP Morgan Chase Bank.

The Gates plaintiffs litigated for two years in Illinois seeking a court order granting them the Syrian funds to satisfy their judgment. Part of that litigation was defending the priority of their claim against a competing claim by the Baker plaintiffs, another group of victims of terrorism seeking to satisfy their own judgment against Syria. The Baker

plaintiffs intervened in the Gates suit in 2012. The district court ruled that the Gates plaintiffs had priority over the Baker plaintiffs and issued two turnover orders. A May 13, 2013 order directed the release of the funds held by AT&T, and a February 3, 2014 order directed the release of the funds held by JP Morgan Chase. The Baker plaintiffs appealed those orders to this court. On June 18, 2014, we issued an opinion affirming both of the district court's turnover orders. *Gates*, 755 F.3d 568.

The Gates plaintiffs promptly moved for an order directing the clerk of the Northern District of Illinois to release the assets to them. Two days later, on August 17, 2014, the Wyatt plaintiffs took their first action regarding the Gates lawsuit in Illinois. The Wyatt plaintiffs filed not a motion to intervene but a memorandum of opposition contesting the Gates plaintiffs' right to the assets. The Gates plaintiffs moved to strike the filing. The district court held a hearing and on October 22, 2014 granted the Gates plaintiffs' motion to release funds. The Wyatt plaintiffs' appeal of that order was docketed as No. 14-3344.

## 2. *Procedural History of Appeal No. 14-3327*

On August 11, 2014, the Wyatt plaintiffs had also filed a separate action in the Northern District of Illinois, No. 14-cv-6161. They named Syria as the defendant and the Gates plaintiffs as third-party defendants. In that action, the Wyatt plaintiffs registered their judgment from the District of Columbia action and served a citation to discover assets on the clerk of court for the Northern District of Illinois. (By that time, JP Morgan Chase and AT&T had placed the disputed funds in the district court's registry.) The Wyatt plaintiffs also moved for the turnover and release of the assets. The

Gates plaintiffs moved to dismiss the complaint for failure to state a claim and lack of jurisdiction. Also on October 22, 2014, the district court dismissed the Wyatt plaintiffs' complaint. The court also denied the Wyatt plaintiffs' motion to stay that decision a few weeks later. The Wyatt plaintiffs' appeal of those orders was docketed as No. 14-3327.

II. *Jurisdiction*

Jurisdiction is a threshold issue that we must address before discussing the merits. *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 657 (7th Cir. 2010). We first explain why we have jurisdiction to hear these appeals and then why the district court had jurisdiction to enter the orders the Wyatt plaintiffs ask us to review.

A. *Appellate Jurisdiction*

The Gates plaintiffs challenge on two grounds our jurisdiction to hear these appeals. First, they argue the Wyatt plaintiffs had no right to challenge the turnover order awarding the assets to the Gates plaintiffs. This argument challenges our jurisdiction to hear appeal No. 14-3344. Second, the Gates plaintiffs argue that both appeals are moot because we have no power to order a meaningful remedy. We address these arguments in turn.

1. *Right of Wyatt Plaintiffs to Challenge the Turnover Order*

The Gates plaintiffs maintain that we do not have jurisdiction over No. 14-3344 because the Wyatt plaintiffs never properly became, or tried to become, parties to the case in the district court, so that they have no right to appeal the order releasing the funds. The Gates plaintiffs complain that the Wyatt plaintiffs flouted the Federal Rules of Civil Proce-

dure by failing to apply for intervention under Rule 24, which requires a party seeking intervention to file a timely motion stating the grounds for intervention, accompanied by a pleading setting forth the claim. Without a motion to intervene, say the Gates plaintiffs, the Wyatt plaintiffs never became parties to the Gates action and cannot appeal the order in that case.

The Wyatt plaintiffs respond that the Gates action in Illinois sought to attach Syrian assets to execute the final judgment of another federal court, so their ability to participate should be governed by Illinois law. Federal Rule of Civil Procedure 69(a) provides that attachment and execution procedures to satisfy a federal judgment "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." The Wyatt plaintiffs contend they were not required to intervene to assert their claim to the Syrian assets.

Intervention is ordinarily the proper path to assert rights in a federal civil case to which one is not yet a party. There are a few exceptions to that general rule, however. In entertaining the appeal of a law firm challenging distribution of fees out of a class settlement, we held the firm was a party even though it never intervened: "Intervention isn't the only route for becoming a party. Nonparties in a trial court can participate as parties to the appeal without formal intervention if the outcome of the appeal would be likely to determine (not just affect) their rights." *In re Trans Union Corp. Privacy Litig.*, 664 F.3d 1081, 1084 (7th Cir. 2011). In *Trans Union*, we relied in part on *SEC v. Enterprise Trust Co.*, 559 F.3d 649, 651 (7th Cir. 2009), which held that persons claiming rights in property in receivership could appeal the district

court's approval of the receiver's plan without having formally intervened.

Because Rule 24 intervention is not quite the exclusive method for joining a lawsuit to appeal a district court order, we apply Rule 69 and look to Illinois law on attachment and execution to determine whether this procedure was proper.[1] Illinois law on the procedure for attachment and execution of a judgment gives adverse claimants to property the right to appear and maintain a claim before their interest in the property is extinguished. The statute on these supplementary proceedings provides:

> If it appears that any property, chose in action, credit or effect discovered, or any interest therein, is claimed by any person, the court shall, as in garnishment proceedings, permit or require the claimant to appear and maintain his or her right. The rights of the person cited and the rights of any adverse claimant shall be asserted and determined pursuant to the law relating to garnishment proceedings.

735 Ill. Comp. Stat. 5/2-1402(g). This provision incorporates the law of garnishment proceedings, which provides:

> *In the event any indebtedness or other property due from or in the possession of a garnishee is claimed by any other person, the court shall permit the claimant to appear and maintain his or her claim. A*

---

[1] We took this approach in a non-precedential decision involving quite similar issues. *United States v. Macchione*, 309 Fed. App'x 53, 55 (7th Cir. 2009) (looking to Illinois law to determine the right of adverse claimants to appear even without formal intervention).

claimant not voluntarily appearing shall be served with notice as the court shall direct. If a claimant fails to appear after being served with notice in the manner directed, he or she shall be concluded by the judgment entered in the garnishment proceeding.

735 Ill. Comp. Stat. 5/12-710(a) (emphasis added). The statute further provides that an adverse claimant who appears and files a timely claim is "a party to the garnishment proceeding" whose "claim shall be tried and determined with the other issues in the garnishment action." 735 Ill. Comp. Stat. 5/12-710(b).

The Wyatt plaintiffs argue that these statutes permit them, without Rule 24 intervention, to oppose the release of funds in the Gates case in district court and to appeal the court's adverse decision because they are adverse claimants entitled to an opportunity to have their claim heard. They interpret these statutes to mean that their claim on the assets can be resolved only after they received proper notice and an opportunity to appear and maintain their claim. Because they never received notice, they argue, the district court, and this court on appeal, must address their claim to the assets to give them the opportunity to be heard granted by Illinois law.

The Wyatt plaintiffs rely on an Illinois decision holding it was reversible error to deny an adverse claimant the opportunity to prove his claim. See *B.J. Lind & Co. v. Diacou*, 278 N.E.2d 526, 529 (Ill. App. 1971) (reversing citation judgment and directing on remand that "all parties be afforded the opportunity to prove their respective claims"). Illinois law undoubtedly favors giving an adverse claimant an oppor-

tunity to be heard before extinguishing the claim. See 735 Ill. Comp. Stat. 5/2-1402(g) ("If it appears" there is an adverse claim, "the court shall, as in garnishment proceedings, permit or require the claimant to appear and maintain his or her right."); *Bloink v. Olson*, 638 N.E.2d 406, 411 (Ill. App. 1994) (holding that if third party claims entitlement to assets of judgment debtor, "a trial must be held to ascertain the parties' rights to the disputed property").

On the other hand, there are reasons to distinguish the Wyatt plaintiffs' procedural maneuver from the usual adverse claim contemplated by these statutes and cases. First, the Wyatt plaintiffs presented their adverse claim only after the Gates plaintiffs had obtained a final judgment awarding them the assets. Second, the Wyatt plaintiffs do not claim that either the Gates plaintiffs or the parties holding the assets (Chase and AT&T) can be faulted for failing to give notice of the proceedings. The Wyatt plaintiffs acquired their claim to the Syrian assets months after the district court ordered the turnover of the assets. At the time of the turnover proceedings, neither the Gates plaintiffs nor the parties holding the assets had notice of an adverse claim by the Wyatt plaintiffs.

Illinois law tells us, however, that the first distinguishing fact—the Wyatt plaintiffs' attempt to upset a final judgment—does not necessarily bar their attempt to have their claim heard. More than a century ago, an Illinois appellate court heard the appeal of an adverse claimant who appeared before the district court two weeks after judgment was entered in favor of a judgment creditor. *Paepcke-Leicht Lumber Co., v. Becker, for Use of*, 124 Ill. App. 311, 312 (1906). The adverse claimant moved to vacate the judgment, but the trial

court refused to upset the judgment or allow the claimant to interplead in the case. The appellate court reversed: "It is no answer to appellant's claim that a judgment was entered prior to his motion for leave to interplead. The court had ample power to vacate that judgment during the term at which it was rendered." *Id*. at 317. The *Paepcke-Leicht Lumber* case signals that the final judgment in favor of the Gates plaintiffs does not bar us from considering the merits of the Wyatt plaintiffs' claim.

Illinois law is less clear, however, on the second issue: whether an adverse claimant is entitled to maintain her claim even when neither the judgment creditor nor the parties holding the assets had notice of the claim. Several cases, including *Paepcke-Leicht Lumber*, hold that an adverse claim should be heard whether notice of the garnishment proceedings is given to the holder of the assets before or after assignment of funds in the account when there are sufficient funds in the account. *Id.* ("The bank should have stated, in its answer to the interrogatories, for its own protection, the claim of which appellant had apprised it."); *Chott v. Tivoli Amusement Co.*, 82 Ill. App. 244, 248-49 (1899) ("If the garnishee has notice or information that a third party claims an interest in the fund or property in controversy, he must, if he would protect himself against such claim, disclose it by his answer, even though he can not, of his own knowledge, swear to the existence of the claim or its precise nature."). These cases indicate that the failure to give notice to a *known* claimant can justify consideration of a post-judgment claim. That does not mean that prior knowledge of the claim is necessary for a court to hear it. No Illinois case that we are aware of answers whether prior knowledge is required.

As a federal court applying state law, our duty is to apply Illinois law as we believe the Illinois Supreme Court would, and in doing so, we accord great weight to the decisions of appellate courts. *Liberty Mutual Fire Ins. Co. v. Statewide Ins. Co.*, 352 F.3d 1098, 1100 (7th Cir. 2003). The question is admittedly close, but we believe the Illinois courts would more likely than not entertain the adverse claim on the merits, even when the garnishee and judgment creditor had no prior knowledge of the claim, so long as the claimant had also been given no notice of the attachment litigation. We would not be surprised if the Illinois courts were to decide this question the other way, given the great interest in finality of judgments, but our prediction is consistent with the preference in Illinois law for giving adverse claimants a fair opportunity to be heard before extinguishing their claims. A rule flatly barring courts from hearing later-raised adverse claims would risk placing even fraudulent prior claims beyond review. At the same time, we recognize that the approach we adopt today is subject to abuse by fraudulent and frivolous claims by greedy interlopers and bystanders. In such cases (but this is not one), courts have available and should employ sanctions and other tools firmly to discourage such abuse. For these reasons, we conclude that the Wyatt plaintiffs' failure to seek to intervene in the district court does not bar them from appealing the district court's turnover order.

2. *Mootness of Both Appeals*

The Gates plaintiffs next argue that both appeals are moot because the funds that were in the custody of the district court have already been disbursed to them. They claim it is no longer possible for this court or the district court to fashion meaningful relief for the Wyatt plaintiffs because we

do not have the power to order that money now in the hands of the Gates plaintiffs be returned to the court or given to the Wyatt plaintiffs. See *A.B. v. Housing Auth. of South Bend*, 683 F.3d 844 (7th Cir. 2012) (a case is moot if no form of meaningful relief is possible). In the absence of a live controversy, the Gates plaintiffs argue, the appeals should be dismissed. See *Milwaukee Police Ass'n v. Board of Fire & Police Comm'rs of Milwaukee*, 708 F.3d 921 (7th Cir. 2013).

We hold the cases are not moot because we have the equitable power to require the return of the funds if the order releasing them was erroneous. As the Supreme Court explained almost a hundred years ago, it is a "principle, long established and of general application, that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby. This right, so well founded in equity, has been recognized in the practice of the courts of common law from an early period." *Arkadelphia Milling Co. v. St. Louis Southwestern Railway Co.*, 249 U.S. 134, 145 (1919); see also *In re Zurn*, 290 F.3d 861, 862 (7th Cir. 2002) (noting that litigant should return money obtained from a judgment reversed on appeal but observing that state court was right forum for dispute); *Buzz Barton & Associates, Inc. v. Giannone*, 483 N.E.2d 1271, 1275 (Ill. 1985) ("[I]f a party has received benefits from an erroneous decree or judgment, he must, after reversal, make restitution, and if he has sold the property erroneously adjudged to belong to him, he must account to the true owners for its value.").

The Gates plaintiffs point out that these cases cited by the Wyatt plaintiffs involved bilateral relations, where the court ordered one party to return funds wrongfully obtained from

the other party to the case. But the presence of an additional party—here the funds originally belonged to Syria but were disbursed to the Gates plaintiffs and now are sought by the Wyatt plaintiffs—does not defeat our jurisdiction to correct a disbursement if it was wrongful. We have considered this question in interpleader cases and held that we have jurisdiction to set aside an erroneous distribution order and to direct the defendant who received the funds to pay them to another defendant, the rightful recipient. *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 798–99 (7th Cir. 1980); see also *General Railway Signal Co. v. Corcoran*, No. 89 C 9360, 1992 WL 220604, at *4–5 (N.D. Ill. Sept. 4, 1992) (Rovner, J.) (declining to limit *Smith* to Rule 60(b) motions and concluding that a district court retains jurisdiction to vacate an order of distribution regardless of whether the court or a claimant holds the funds).[2]

Accordingly, if the Wyatt plaintiffs were to prevail on the merits and demonstrate that the turnover orders were issued erroneously, we would have the power to order the Gates

---

[2] To be clear, no one contends that any party to this dispute has committed any sort of fraud on any court. But if we accepted the Gates plaintiffs' argument that we have no jurisdiction even to consider the Wyatt plaintiffs' claim, then it would also be beyond our jurisdiction to correct an order disbursing funds even if it had been obtained by fraud. That troubling proposition could allow litigants to use the court's imprimatur to legalize fraud. During oral argument, the Gates plaintiffs responded to the fraud hypothetical by saying that Rule 60(b)—which lists fraud as a ground for relief from a final judgment—could be used to correct the fraud. But that answer implicitly concedes that it would be possible to fashion a remedy, which means that the appeals are not moot and that we have jurisdiction to decide the merits.

plaintiffs to return the funds. Because it is possible for a court to award meaningful relief, the appeals are not moot.[3]

B.  *Jurisdiction of the District Court*

The Wyatt plaintiffs raise a different jurisdictional issue, challenging the jurisdiction of the district court. They contend that the district court had no jurisdiction to issue the November 6 order releasing the funds after the Wyatt plaintiffs filed their notice of appeal on October 22, 2014, which divested the district court of jurisdiction. The Wyatt plaintiffs argue that the court's November 6 order—granting the Gates plaintiffs' motion for release of the funds—is void because it was entered without jurisdiction. See *Kusay v. United States*, 62 F.3d 192, 194 (7th Cir. 1995) (declaring that any action by the district court after the notice of appeal was filed but before the mandate from the court of appeals issues is a "nullity").[4]

---

[3] To support their mootness argument, the Gates plaintiffs also rely on *Porco v. Trustees of Indiana University*, 453 F.3d 390, 394–95 (7th Cir. 2006). That case is plainly distinguishable. We held Porco's suit was moot because the Eleventh Amendment precluded us from ordering the defendant, a state university, to return money that had been disbursed according to a court order. The Eleventh Amendment poses no bar to relief in this suit because none of the Gates plaintiffs is a state.

[4] The district court's November 6 order also denied the Wyatt plaintiffs' motion to stay the release of funds. The district court clearly had jurisdiction to deny the Wyatt plaintiffs' motion to stay the release of the funds. Federal Rule of Appellate Procedure 8(a)(1)(A) provides that a party to an appeal should "ordinarily move first in the district court for … a stay of the judgment or order of a district court pending appeal." That rule would make no sense if a district court lacked jurisdiction to rule on the motion for a stay of its judgment pending appeal.

Our cases holding that the notice of appeal transfers exclusive jurisdiction to the court of appeals have explained that the district court is divested of control over only "those aspects of the case involved in the appeal." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1240 (7th Cir. 1986). That rule "does not prevent the court from handling collateral matters such as the award of costs and … the collection of a judgment." *Chicago Truck Drivers Pension Fund v. Central Transport, Inc.*, 935 F.2d 114, 119–20 (7th Cir. 1991). Even after a notice of appeal has been filed, the district court retains the power to take further action "in aid of execution of a judgment that has not been stayed or superseded." *Henry*, 808 F.2d at 1240.

The district court's November 6, 2014 order was in aid of execution of a judgment, not a new judgment that exceeded its jurisdiction. The district court had ordered the turnover of the funds to the Gates plaintiffs on May 13, 2013 and February 3, 2014. After that decision was affirmed on appeal by this court and the case was returned to the district court in August 2014, the Wyatt plaintiffs filed their opposition. The district court considered the Wyatt plaintiffs' claim but ultimately issued a final judgment against them, dismissing their claim, on October 22. The district court and this court declined to stay that judgment pending appeal. The court's November 6 order for release of the funds was therefore a proper execution of its judgments awarding the funds to the Gates plaintiffs and denying the Wyatt plaintiffs' opposition. The district court was acting within its jurisdiction.

III. *The Priority of the Competing Claims*

We come at last to the merits of the dispute. The Gates plaintiffs registered their judgment and served a citation to

discover assets on December 8, 2011. Under Illinois law, that gave the Gates plaintiffs a perfected lien on the assets as of that date. See *Gates*, 755 F.3d at 578, citing 735 Ill. Comp. Stat. 5/2-1402(m). If the Gates plaintiffs' judgment, attachment, and execution are valid, then they plainly have priority over the Wyatt plaintiffs, who did not register a judgment and serve a citation to discover assets until nearly three years later.

The Wyatt plaintiffs claim that the Gates plaintiffs are not entitled to the Syrian assets identified in the Northern District of Illinois because the Gates plaintiffs failed to comply with § 1608(e) of the FSIA. That provision requires that a foreign state be served with any default judgment entered against it: "A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section." 28 U.S.C. § 1608(e). For the purposes of our discussion of this argument, we assume that the Wyatt plaintiffs are correct in asserting that the Gates plaintiffs have not complied with the service requirements of § 1608(e).[5]

---

[5] The Gates plaintiffs had the clerk of court send a copy of the default judgment to Syria via a private courier service, but the delivery was rejected in Syria. Section 1608(a)(2) requires that documents that are served by mail be sent "requiring a signed receipt," which the Gates plaintiffs admit they never obtained. The Gates plaintiffs claim that they satisfied § 1608(e) even though they never received a signed receipt. Most courts have interpreted § 1608 to require strict compliance with the specific rules for service on foreign states. E.g., *Magness v. Russian Federation*, 247 F.3d 609, 615 (5th Cir. 2001) ("We conclude that the provisions for service of process upon a foreign state or political subdivision of a foreign state outlined in section 1608(a) can only be satisfied by strict compliance."); but see *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117,

The Wyatt plaintiffs' argument fails to deal with the structure and terms of the FSIA, and in particular with its special provisions for claims for state-sponsored terrorism. The statutory consequence of failing to satisfy the service requirement in § 1608(e) is that plaintiffs with a judgment against a foreign state cannot obtain authorization under § 1610(c) to proceed to attachment and execution of that judgment. Section 1610(c) provides:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

28 U.S.C. § 1610(c). Subsections (a) and (b) list categories of assets of foreign states, and of their agencies and instrumentalities, that can be attached in aid of execution of a judgment obtained through a suit authorized by the FSIA. Accordingly, a plaintiff who does not serve a copy of the default judgment to satisfy § 1608(e) is not entitled to authorization to execute the judgment under § 1610(c).

---

1129 (9th Cir. 2010) ("The Ninth Circuit has adopted a substantial compliance test for the FSIA's notice requirements and … the defendant had actual notice."). We do not decide what § 1608(e) requires, nor whether the Gates plaintiffs have satisfied those requirements, because the Gates plaintiffs were entitled to execute their judgment against the Syrian assets without complying with § 1608(e).

The critical point here, however, is that the Gates plaintiffs are not executing their judgment under § 1610(c) or under § 1610(a) or (b), the provisions cross-referenced in § 1610(c). The Gates plaintiffs obtained § 1610(c) authorization from the district court in the District of Columbia, which the Wyatt plaintiffs claim was an error. That order was unnecessary. The Gates plaintiffs are seeking to execute a judgment for state-sponsored terrorism, so they may proceed through the execution provision specifically enacted for terrorism judgments, § 1610(g).

As we held in *Gates*, "§ 1610(c) simply does not apply to the attachment of assets to execute judgments under § 1610(g) for state-sponsored terrorism." 755 F.3d at 575. We reached that conclusion based on the structure and language of the FSIA and its legislative history. We also found that conclusion was consistent with the legislative purpose behind the 2008 FSIA Amendments that added § 1610(g) to the statute. The purpose of those amendments was "to make it easier for terrorism victims to obtain judgments and to attach assets." *Id*. at 576. "Exempting attachments under § 1610(g), that is, attachments stemming from terrorism-related judgments, from § 1610(c)'s solicitous notice requirements is entirely consistent with the liberalizing purpose of the 2008 Amendments." *Id*. at 576–77.

The service of default judgments under § 1608(e) is one of § 1610(c)'s solicitous notice requirements, from which attachments under § 1610(g) are exempt. The Gates plaintiffs, as terrorism victims who obtained a judgment under § 1605A, could proceed to attachment and execution under § 1610(g) without complying with § 1610(c). That means they are also exempt from § 1608(e), at least as a prerequisite for

attachment and execution. A failure to comply with § 1608(e) does not render invalid their attachment of assets and satisfaction of their judgment for state-sponsored terrorism.

The Gates plaintiffs were therefore entitled to priority, so we affirm the district court's orders challenged in these appeals disbursing funds to the Gates plaintiffs and dismissing the Wyatt plaintiffs' challenges to them. We affirm without needing to address several alternative arguments for affirmance, including whether these appeals amount to improper collateral challenges to the District of Columbia court's issuance of a § 1610(c) order to the Gates plaintiffs, whether the mandate rule foreclosed the Wyatt plaintiffs' efforts after *Gates*, and whether the Wyatt plaintiffs waived their challenges by not pursuing their unsuccessful effort to intervene in the Gates case in the District of Columbia years before judgment was entered.

The orders of the district court are AFFIRMED.