In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 14-1935

JENNY RUBIN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ISLAMIC REPUBLIC OF IRAN,

*Defendant-Appellee*,
*and*

FIELD MUSEUM OF NATURAL HISTORY, *et al.*,

*Respondents-Appellees*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 9370 — **Robert W. Gettleman**, *Judge*.

———————————

ARGUED APRIL 23, 2015 — DECIDED JULY 19, 2016

———————————

Before BAUER and SYKES, *Circuit Judges*, and REAGAN,
*Chief District Judge*.*

———————————

* Of the Southern District of Illinois, sitting by designation.

SYKES, *Circuit Judge*. In September 1997 three Hamas suicide bombers blew themselves up on a crowded pedestrian mall in Jerusalem. Among those grievously injured were eight U.S. citizens who later joined with a handful of their close relatives to file a civil action against the Islamic Republic of Iran for its role in providing material support to the attackers. Iran was subject to suit as a state sponsor of terrorism under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), then codified at 28 U.S.C. § 1605(a)(7). A district judge in the District of Columbia entered a $71.5 million default judgment. Iran did not pay.

So began more than a decade of unsuccessful litigation across the country to attach and execute on Iranian assets in order to satisfy the judgment. *See Rubin v. Islamic Republic of Iran*, No. Civ. A. 01-1655 (RMU), 2005 WL 670770, at *1 (D.D.C. Mar. 23, 2005), *vacated*, 563 F. Supp. 2d 38 (D.D.C. 2008) (granting and then vacating writs of execution against two domestic bank accounts used by Iranian consulates); *Rubin v. Islamic Republic of Iran*, 810 F. Supp. 2d 402 (D. Mass. 2011), *aff'd*, 709 F.3d 49 (1st Cir. 2013) (rejecting an effort to attach Iranian antiquities in the possession of various museums); *Rubin v. Islamic Republic of Iran*, 33 F. Supp. 3d 1003 (N.D. Ill. 2014) (same). This appeal concerns the last decision on this list.

The plaintiffs sought to execute on four collections of ancient Persian artifacts located within the territorial jurisdiction of the Northern District of Illinois: the Persepolis Collection, the Chogha Mish Collection, and the Oriental Institute Collection, all in the possession of the University of Chicago; and the Herzfeld Collection, split between the University and Chicago's Field Museum of Natural History. The case

was last here on some procedural issues early in the attachment proceeding. *See Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011), *cert. denied*, 133 S. Ct. 23 (2012). It now returns on the merits.

A foreign state's property in the United States is immune from attachment and execution, *see* 28 U.S.C. § 1609, but there are a few narrow exceptions. The plaintiffs identified three possible paths to reach the artifacts: subsections (a) and (g) of 28 U.S.C. § 1610, both part of the FSIA; and section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note), which permits holders of terrorism-related judgments to execute on assets that are "blocked" by executive order under certain international sanctions provisions. The district court entered judgment against the plaintiffs, finding no statutory basis to execute on the artifacts.

We affirm. The assets are not blocked by existing executive order, so execution under TRIA is not available. Nor does § 1610(a) apply. That provision permits execution on a foreign state's property "used for a commercial activity in the United States." We read this exception to require commercial use by the foreign state itself, not a third party. Iran did not put the artifacts to any commercial use.

Lastly, § 1610(g) is not itself an exception to execution immunity. Instead, it partially abrogates the so-called *Bancec* doctrine, which holds that a judgment against a foreign state cannot be executed on property owned by its juridically separate instrumentality. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 626–29 (1983). The *Bancec* rule can be overcome in two ways: The holder of a judgment against a foreign state may execute on

the property of its instrumentality if the sovereign and its instrumentality are alter egos or if adherence to the rule of separateness would work an injustice. *Id*.

Section 1610(g) lifts the *Bancec* rule for holders of terrorism-related judgments, allowing attachment in aid of execution "as provided in this section" without regard to the presumption of separateness—that is, without the requirement of establishing alter-ego status or showing an injustice. The phrase "as provided in this section" refers to the immunity exceptions found elsewhere in § 1610, one of which must apply to overcome execution immunity. So although subsection (g) substantially eases the enforcement process for terrorism victims by removing the *Bancec* barrier, it is not a freestanding terrorism exception to execution immunity.

## I. Background

The artifacts at issue here arrived in the United States over a 60-year timespan beginning in the 1930s. In 1937 Iran loaned the Persepolis Collection—roughly 30,000 clay tablets and fragments containing some of the oldest writings in the world—to the University of Chicago's Oriental Institute for research, translation, and cataloguing. In 1945 the Field Museum purchased a collection of approximately 1,200 prehistoric artifacts from Dr. Ernst Herzfeld, a German archaeologist active in Persia in the early 20th century (the Herzfeld Collection). In the 1960s Iran excavated clay seal impressions from the ancient Chogha Mish settlement and loaned them to the University's Oriental Institute for academic study (the Chogha Mish Collection). Most items in this collection were returned to Iran in 1970, but the University has since located some objects previously missing from the collection. In the 1980s and 1990s, the Oriental Institute

received several small donations of Persian artifacts from Iran and other donors. These artifacts are not really a discrete collection, but the parties refer to them as the "Oriental Institute Collection," so we'll do the same.

The plaintiffs are American victims of a suicide-bomb attack carried out by Hamas in Jerusalem on September 4, 1997, with material support from Iran. In 2003 the survivors and their close family members filed suit against Iran in federal court in the District of Columbia, proceeding under the terrorism exception to jurisdictional sovereign immunity, then codified at § 1605(a)(7) of the FSIA. (In January 2008 Congress repealed § 1605(a)(7) and enacted a new terrorism exception to jurisdictional sovereign immunity codified at 28 U.S.C. § 1605A. *See* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44.)

The plaintiffs won a $71.5 million default judgment, *see Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003), and quickly commenced enforcement actions around the country in an effort to collect. As relevant here, the plaintiffs registered the judgment in the Northern District of Illinois, initiating attachment proceedings for the purpose of executing on the four collections then in the possession of the University and the Field Museum.[1] (We'll refer to the University and the Field Museum collectively as "the Museums" unless the context requires otherwise.)

_____

[1] The plaintiffs later converted their § 1605(a)(7) judgment to one under § 1605A. *See Rubin v. Islamic Republic of Iran*, 270 F.R.D. 7, 9 & n.3 (D.D.C. 2010).

Significant procedural battles ensued. We resolved these disputes in our earlier opinion and need not repeat that litigation history. *See Rubin*, 637 F.3d at 786–89. For present purposes it's enough to note that the plaintiffs initially proposed two possible ways to overcome Iran's execution immunity. First, they invoked § 1610(a), the "commercial activity" exception to execution immunity. Second, they pointed to TRIA, which permits execution on the blocked assets of a state sponsor of terrorism (or its agency or instrumentality) to satisfy a judgment obtained under the terrorism exception to jurisdictional sovereign immunity.

After we sent the case back to the district court, the parties engaged in discovery on the four collections, and Iran and the Museums moved for summary judgment. The district judge granted the motion. First, he rejected the plaintiffs' claim that the artifacts are subject to execution under § 1610(a). The judge read this exception as limited to property used for a commercial activity *by the foreign state itself*. Because Iran hadn't used the artifacts for commercial activity, the judge held that § 1610(a) does not apply.

The judge also held that because the assets in question are not blocked—i.e., frozen—by any current executive order, execution under TRIA is likewise unavailable.

Finally, in their response to the summary-judgment motion, the plaintiffs identified a third possible path to reach the artifacts: § 1610(g), which they argued is an independent exception to execution immunity available to victims of state-sponsored terrorism. The judge rejected this argument too, concluding that subsection (g) abrogates the *Bancec* rule for terrorism-related judgments but is not a freestanding terrorism exception to execution immunity.

Finding no statutory basis to execute on the artifacts, the judge entered judgment for Iran and the Museums. The plaintiffs appealed, reprising all three arguments.

## II. Discussion

### A. Which Artifacts Remain at Issue?

Our first task is to identify which of the four collections is even potentially subject to attachment and execution at this juncture. Two basic criteria apply: (1) the artifacts must be owned by Iran, and (2) the artifacts must be within the territorial jurisdiction of the district court. *See Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2257 (2014) ("Our courts generally lack authority in the first place to execute against property in other countries … .") (citation omitted); *see also Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world. We would need some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction.").

There's no dispute that the Persepolis Collection is owned by Iran and is in the physical possession of the University. The three other collections, however, are outside the reach of this proceeding for reasons relating to their present location or the absence of Iranian ownership.

As we've just explained, when the district court entered judgment, the University had possession of remnants of the Chogha Mish Collection. But intervening developments have placed these artifacts beyond the grasp of the federal courts. After filing their notice of appeal, the plaintiffs asked

us to stay the district court's judgment pending appeal. We denied the motion. The State Department then informed the University that the United States was obligated to return the Chogha Mish artifacts to Iran. The University, in turn, notified us that it would return the Chogha Mish artifacts to Iran within 45 days unless the court ordered otherwise. We did not order otherwise. So the University delivered the artifacts to Iran's National Museum in Tehran and filed notice with the court that Iran received and accepted them. Accordingly, the Chogha Mish Collection is no longer within the territorial jurisdiction of the district court.

The Herzfeld and the Oriental Institute Collections remain within the court's territorial jurisdiction, but they are not Iranian property. The plaintiffs have tried to cast doubt on the legitimacy of their removal from Iran, arguing that Dr. Herzfeld is regarded by some in the academic community as a plunderer and that the artifacts in these collections are covered by Iran's National Heritage Protection Act of 1930, which gives the government of Iran an option to exercise control over certain antiquities unearthed in the country. The Museums, on the other hand, maintain that they were bona fide purchasers or recipients of these collections; the plaintiffs have not meaningfully contested this point.

We don't need to resolve any questions about the provenance of the Herzfeld and Oriental Institute Collections or explore the circumstances under which the Museums acquired them. As the plaintiffs concede, Iran has expressly disclaimed any legal interest in the two collections, and the district judge found that no evidence supports Iranian

ownership of these artifacts. The plaintiffs have not given us any reason to disturb this ruling, and we see none ourselves.

Because the Chogha Mish Collection is no longer within the territorial jurisdiction of the district court and Iran has disclaimed ownership of the Herzfeld and Oriental Institute Collections, we confine our merits review to the Persepolis Collection.

**B. Statutory Framework**

We traced the history of the foreign sovereign immunity doctrine and the enactment of the FSIA in our earlier opinion. *See Rubin*, 637 F.3d at 792–94. A brief repetition is helpful to a proper understanding of the statutory-interpretation questions presented here.

Foreign sovereign immunity "is a matter of grace and comity on the part of the United States," and for much of our nation's history was left to the discretion of the Executive Branch. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). As such, federal courts "consistently … deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Id*. Under the common-law doctrine, a diplomatic representative of the foreign state would request a "suggestion of immunity" from the State Department, and if the State Department obliged, the court would surrender jurisdiction without further inquiry; absent a suggestion of immunity, the court would decide the immunity question itself based on policies established by the State Department. *Rubin*, 637 F.3d at 793. Either way, "[t]he process … entailed substantial judicial deference to the Executive Branch." *Id*.

Even if a court acquired jurisdiction and awarded judgment against a foreign state, "the United States gave absolute immunity to foreign sovereigns from the execution of judgments." *Autotech*, 499 F.3d at 749. Successful plaintiffs had to rely on voluntary payment by the foreign state. *Id.*

In 1952 the State Department adopted a "restrictive" theory of foreign sovereign immunity, conferring jurisdictional immunity in cases arising out of a foreign state's "public acts" but withholding it in "cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U.S. at 487. "Under the restrictive, as opposed to the 'absolute,' theory of foreign sovereign immunity, a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)." *Saudi Arabia v. Nelson*, 507 U.S. 349, 359–60 (1993). Even under this theory, however, foreign sovereign property remained absolutely immune from execution. *Autotech*, 499 F.3d at 749.

The State Department's shift to the restrictive theory of jurisdictional immunity "'thr[ew] immunity determinations into some disarray,' since 'political considerations sometimes led the Department to file suggestions of immunity in cases where immunity would not have been available.'" *NML Capital*, 134 S. Ct. at 2255 (brackets in original) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004)). Essentially, "sovereign immunity determinations were [being] made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied." *Verlinden*, 461 U.S. at 488.

In 1976 Congress stepped in and enacted the FSIA, which "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity first endorsed by the State Department in 1952." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992). The Act establishes a "comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Verlinden*, 461 U.S. at 488. "The key word … is *comprehensive*." *NML Capital,* 134 S. Ct. at 2255. "[A]ny sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *Id.* at 2256.

The Act codifies the two common-law immunities we've just discussed—jurisdictional immunity (28 U.S.C. § 1604) and execution immunity (*id.* § 1609). Only the latter is at issue here. Section 1609 states that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter." Accordingly, the Persepolis Collection is immune from attachment and execution unless an exception listed in § 1610 applies. (Section 1611 of Title 28 of the U.S. Code lists exceptions to the exceptions and is not implicated here.)

The most prominent are the so-called commercial-activity exceptions found in subsections (a) and (b) of § 1610. Under § 1610(a) a person who holds a judgment against a foreign state may execute it on the foreign state's property "used for a commercial activity in the United States" *if* one of seven listed conditions is met. Similarly, under § 1610(b) a person who holds a judgment against a foreign state's instrumentality may execute it on "any property in the United States of [the] … instrumentality … engaged in

commercial activity in the United States" *if* one of three listed conditions is met.

So to summarize, at common law execution immunity was absolute, *Autotech*, 499 F.3d at 749, but subsections (a) and (b) of § 1610 together codify a narrower version of the restrictive theory of jurisdictional immunity for the execution of judgments, allowing successful claimants to attach and execute on foreign sovereign property "used for a commercial activity" in this country, at least in some circumstances.[2]

The plaintiffs point to § 1610(a) and § 1610(g) as possible paths to reach the artifacts. They also rely on section 201(a) of TRIA. We turn to these arguments now.

### C. 28 U.S.C. § 1610(a)

As we've just explained, § 1610(a) establishes rules for executing a judgment against a foreign state on the foreign state's property; § 1610(b) establishes rules for executing a judgment against a foreign state's instrumentality on the instrumentality's property. The judgment here is against Iran, and Iran owns the Persepolis Collection, so subsection (a) is the relevant subsection.

Generally speaking, § 1610(a) permits the holder of a judgment against a foreign state to execute on property of the foreign state "used for a commercial activity in the United States" but only if one of seven enumerated condi-

---

[2] Section 1610 also permits in rem execution of certain foreclosure judgments against a foreign state's vessels. 28 U.S.C. § 1610(e). Other parts of § 1610 address, for example, certain procedural requirements for execution, *see, e.g., id.* § 1610(c), and the sensitive matter of prejudgment attachment of foreign sovereign property, *id.* § 1610(d).

tions is satisfied. For example, a judgment creditor may proceed against a foreign state's property "used for a commercial activity in the United States" if the foreign state has expressly or impliedly waived execution immunity, § 1610(a)(1); or if the property in question "was used for the commercial activity upon which the claim is based," § 1610(a)(2); or if "the judgment is based on an order confirming an arbitral award," § 1610(a)(6).

At issue here is subsection (a)(7), which permits attachment and execution if the following terms are met:

> **(a)** The *property in the United States of a foreign state, … used for a commercial activity in the United States, shall not be immune* from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, *if—*
>
> …
>
> **(7)** *the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7)* [the present and former terrorism exceptions to jurisdictional immunity] … regardless of whether the property is or was involved with the act upon which the claim is based.

§ 1610(a)(7) (emphases added).

The plaintiffs obtained their judgment against Iran in 2003 under § 1605(a)(7), the terrorism exception to jurisdictional immunity then in effect. In 2008 Congress replaced § 1605(a)(7) with § 1605A, and the plaintiffs converted their

judgment to one under the new statute. So there's no question that the special condition in subsection (a)(7) is satisfied.

That leaves the basic "commercial activity" requirement of § 1610(a). The dispute here centers on the key statutory phrase identifying the property that may be subject to execution under this exception: "property in the United States of a foreign state … used for a commercial activity in the United States." § 1610(a). The passive-voice phrasing of this sentence raises an interpretive question: *Used by whom?*

The plaintiffs contend that *a third party's* commercial use of the property triggers § 1610(a) and that the University's academic study of the Persepolis Collection counts as a commercial use. Iran and the University counter that the foreign state *itself* must use its property for a commercial activity, and regardless, academic study isn't a commercial use. The United States has weighed in as an amicus curiae on the side of the interpretation urged by Iran and the University—namely, that the exception in § 1610(a) applies *only* when the foreign sovereign itself (not a third party) uses the property for a commercial activity.

We're skeptical that academic study qualifies as a commercial use, but we'll put that question aside and focus on the antecedent one: *Whose commercial use counts?*

The Fifth Circuit has held that § 1610(a) is triggered only when the foreign state *itself* uses its property in the United States for a commercial activity. *See Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 256 n.5 (5th Cir. 2002) ("[W]hat matters under the statute is how the *foreign state* uses the property, not how private parties may have used the property.").

The Second and Ninth Circuits agree. *See Aurelius Capital Partners v. Republic of Argentina*, 584 F.3d 120, 131 (2d Cir. 2009) ("The commercial activities of the private corporations who managed these assets are irrelevant to this inquiry. … [B]efore the retirement and pension funds at issue could be subject to attachment, the funds *in the hands of the Republic* must have been 'used for a commercial activity.'"); *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1090–91 (9th Cir. 2007) (adopting the Fifth Circuit's interpretation).

We think these circuits have understood § 1610(a) correctly. It's true that a legislature's use of the passive voice sometimes reflects indifference to the actor. *See Dean v. United States*, 556 U.S. 568, 572 (2009) ("The passive voice focuses on an event that occurs without respect to a specific actor … ."). But attributing indifference to Congress in this instance would be inconsistent with the FSIA's statutory declaration of purpose, which explicitly invokes the international law understanding of foreign sovereign immunity: "Under international law, states are not immune from the jurisdiction of foreign courts insofar as *their* commercial activities are concerned, and *their* commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with *their* commercial activities." 28 U.S.C. § 1602 (emphases added).

Section 1602 thus instructs courts to interpret the immunities and exceptions in the FSIA against the backdrop of the international law norm that foreign sovereigns do not have immunity for "*their* commercial activities" or immunity from execution on "*their* commercial property." This suggests that a foreign sovereign's property is subject to execution under § 1610(a) only when the sovereign *itself* uses the property for

a commercial activity. While the passive-voice phrasing in
§ 1610(a) introduces some ambiguity about whose commer-
cial use matters, § 1602's declaration of purpose clarifies that
foreign states may lose execution immunity only by virtue of
*their own* commercial use of their property in the United
States, not a third party's.

The plaintiffs object that the declaration of purpose isn't
relevant because resort to legislative history is not necessary
when the statutory language is unambiguous. We disagree
for two reasons. First, § 1602 is *legislation*, not legislative
history. It was written, debated, and enacted by Congress
and signed into law by the President—in the same manner
and at the same time as § 1610. None of the standard objec-
tions to judicial reliance on legislative history inhibit our
resort to a *statutory* declaration of purpose for help in inter-
preting a part of the statute to which it applies.[3]

Second, as we've just noted, the passive-voice phrasing of
§ 1610(a) creates uncertainty about *whose* commercial use of
the property suffices to forfeit a foreign state's execution
immunity. The text itself raises the question, and the uncer-
tainty is all the more apparent when subsection (a) is consid-
ered in its broader statutory context. *See King v. Burwell*,
135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the 'meaning—or
ambiguity—of certain words or phrases may only become
evident when placed in context.' So when deciding whether
the language is plain, we must read the words 'in their
context and with a view to their place in the overall statutory
scheme.'" (citation omitted) (quoting *FDA v. Brown & Wil-*

---

[3] We're not suggesting, however, that a legislative statement of purpose
provides statutory meaning independent of the operative statutory text.

*liamson Tobacco Corp.*, 529 U.S. 438, 450 (2002))). The FSIA starts with a baseline rule of execution immunity; the exceptions are few and "narrowly drawn." *Autotech*, 499 F.3d at 749.

Given the broad protective stance of the statutory scheme in general, we cannot say with confidence that § 1610(a) *unambiguously* abrogates a foreign sovereign's execution immunity when a third party uses its property for a commercial activity. Rather, the statutory declaration of purpose suggests that a narrower interpretation is correct: A foreign state may lose its execution immunity only by *its own* commercial use of its property in the United States.

Trying another tack, the plaintiffs direct our attention to the language of § 1605(a), the commercial-activity exception to jurisdictional immunity, which specifically states that the commercial activity must be "carried on in the United States *by the foreign state*" before immunity is lost. (Emphasis added.) The absence of similar language in § 1610(a), they argue, means that the commercial-activity exception to execution immunity is broader than its parallel in § 1605(a) and applies whenever a third party uses a foreign state's property for a commercial activity.

This argument contradicts the settled principle that the exceptions to execution immunity are narrower than, and independent from, the exceptions to jurisdictional immunity. *NML Capital*, 134 S. Ct. at 2256; *Rubin*, 637 F.3d at 796; *DeLetelier v. Republic of Chile*, 748 F.3d 790, 798–99 (2d Cir. 1984). This principle is both well established and based on a critical diplomatic reality: Seizing a foreign state's property is a serious affront to its sovereignty—much more so than taking jurisdiction in a lawsuit. Correspondingly, judicial

seizure of a foreign state's property carries potentially far-reaching implications for American property abroad.

The plaintiffs' interpretation of § 1610(a) turns this important principle on its head. A third party's commercial use of a foreign state's property, which cannot establish jurisdiction over the foreign state, would suffice to strip the foreign state's property of its execution immunity. That cannot be right.

Accordingly, we join the emerging consensus of our sister circuits and hold that a third party's commercial use of a foreign state's property does not trigger the § 1610(a) exception to execution immunity. Rather, § 1610(a) applies only when *the foreign state itself* has used its property for a commercial activity in the United States; the actions of third parties are irrelevant.

Nothing in the record suggests that Iran itself used the Persepolis Collection for a commercial activity in the United States. Indeed, the plaintiffs do not argue otherwise. The district court reached the correct conclusion: Section 1610(a) does not apply.[4]

### D. 28 U.S.C. § 1610(g)

Alternatively, the plaintiffs argue that § 1610(g) provides an independent basis to execute on the artifacts. A bit of background is necessary before we take up this argument.

Congress enacted § 1610(g) as part of the National Defense Authorization Act of 2008, which ushered in several changes to the FSIA as applied in cases of state-sponsored

---

[4] Our holding makes it unnecessary to decide whether the University's academic study of the Persepolis Collection is a commercial use.

terrorism. We've already mentioned one: Section 1605A replaced § 1605(a)(7), the previous terrorism exception to jurisdictional immunity. Section 1605A includes an identical exception to jurisdictional immunity but "is more comprehensive and more favorable to plaintiffs because it adds a broad array of substantive rights and remedies that simply were not available in actions under" the previous law. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 58 (D.D.C. 2009).

The other major change was the creation of § 1610(g), which applies to execution proceedings to enforce judgments obtained under § 1605A and eases the collection process for victims of state-sponsored terrorism by eliminating the *Bancec* rule that foreign sovereigns and their instrumentalities are treated separately for execution purposes. The 2008 legislation also provided that certain judgments obtained under the old § 1605(a)(7) could be converted to judgments under § 1605A so that judgment creditors could access the benefits of § 1610(g). The plaintiffs successfully converted their judgment, and they now contend that § 1610(g) makes *all* Iranian assets available for execution without proof of a nexus to commercial activity—that is, without having to satisfy § 1610(a). They argue, in other words, that subsection (g) is a freestanding exception to execution immunity for terrorism-related judgments.

Iran and the University dispute that interpretation. They agree that subsection (g) was intended to—and does—make it easier for terrorism victims to enforce their judgments. But they maintain that it does so *only* by abrogating the *Bancec* doctrine for § 1605A judgments; subsection (g) is not itself an exception to execution immunity. The United States supports

this interpretation and joins Iran and the University in urging us to adopt it.

We begin with the *Bancec* doctrine, which derives from the Supreme Court's 1983 decision known by that name. *Bancec* established a general presumption that a judgment against a foreign state may not be executed on property owned by a juridically separate agency or instrumentality. 462 U.S. at 626–27 ("Due respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude … that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.") (citation omitted). That's the general rule in the law of private corporations, and the Court applied it to the juridically separate instrumentalities of foreign governments. *Id.* The Court recognized two exceptions: The holder of a judgment against a foreign state may execute on the property of its instrumentality if the sovereign and its instrumentality are alter egos or if adherence to the rule of separateness would work a fraud or injustice. *Id*. at 628–33.

The Court expressly declined to elaborate on these exceptions, however. *Id*. at 633 ("Our decision today announces no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded."). So the lower courts had to fill the gap. Soon after *Bancec* was decided, the federal courts began to coalesce around a set of five factors for determining when the exceptions applied. *See, e.g.*, *Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1071 n.9 (9th Cir. 2002); *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1380–82, 1380–81 n.7 (5th Cir.

1992). The following formula from the Fifth Circuit is typical; courts should consider:

> (1) The level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*Walter Fuller Aircraft*, 965 F.2d at 1380 n.7.

Fast forward to 2008 and the enactment of the National Defense Authorization Act, which created § 1605A and § 1610(g). In relevant part, § 1610(g) states:

> [T]he property of a foreign state against which a judgment is entered under section 1605A, *and* the property of an agency or instrumentality of such a state, … is subject to attachment … and execution … *as provided in this section*, regardless of—

> > **(A)** the level of economic control over the property by the government of the foreign state;

> > **(B)** whether the profits of the property go to that government;

**(C)** the degree to which officials of that government manage the property or otherwise control its daily affairs;

**(D)** whether that government is the sole beneficiary in interest of the property; or

**(E)** whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(Emphases added.)

Put more succinctly, subsection (g) permits a terrorism victim who wins a § 1605A judgment to execute on the property of the foreign state *and* the property of its agency or instrumentality *"as provided in this section"* but *"regardless of"* the five factors listed in subsections (A)–(E).

As the careful reader no doubt has grasped, the five factors made irrelevant by subsection (g) mirror almost exactly the factors developed by the lower courts under the *Bancec* doctrine. For ease of comparison, we've prepared this chart:

| *Bancec* Doctrine Factors | Factors Made Irrelevant by Subsection (g) |
| --- | --- |
| (1) the level of economic control by the government; | (A) the level of economic control over the property by the government of the foreign state; |
| (2) whether the entity's profits go to the government; | (B) whether the profits of the property go to that govern- |

| | ment; |
|---|---|
| (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; | (C) the degree to which officials of that government manage the property or otherwise control its daily affairs; |
| (4) whether the government is the real beneficiary of the entity's conduct; and | (D) whether that government is the sole beneficiary in interest of the property; or |
| (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations. | (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations. |

The nearly identical language is either a stunning coincidence or Congress drafted subsection (g) to abrogate the *Bancec* doctrine for terrorism-related judgments. It's impossible to ignore the clear textual parallels between subsection (g), the *Bancec* rule, and the preexisting caselaw. Indeed, we've already noted that subsection (g) overrides the *Bancec* doctrine for terrorism-related judgments. *See Gates v. Syrian Arab Republic*, 755 F.3d 568, 576 (7th Cir. 2014).

The key question here—a question not expressly decided in *Gates*—is whether, as the plaintiffs contend, subsection (g) goes further and establishes a freestanding "terrorism" exception to execution immunity.

Iran and the University—with support from the United States—caution against reading a corrective measure so plainly aimed at eliminating the *Bancec* barrier as creating a new and independent exception to execution immunity for all terrorism-related judgments. They direct our attention to language in subsection (g) specifically limiting its scope: The text says that for § 1605A judgments, the property of a foreign state and the property of its agency or instrumentality are "subject to attachment … and execution … *as provided in this section*." The highlighted phrase makes very little sense—indeed, is entirely superfluous—if subsection (g) is itself a freestanding exception to execution immunity. The plaintiffs' reading of subsection (g) thus violates the "cardinal principle" that a statute should be interpreted to avoid superfluity. *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

The plaintiffs suggest that the phrase "as provided in this section" refers to only the "non-substantive rules" set forth in § 1610. But they offer no basis for limiting the phrase in that manner, nor have they identified which non-substantive rules they think Congress meant to include in subsection (g). Moreover, it would be very odd to read "as provided in this *section*" as referring only to certain unidentified *sub*sections of § 1610. The word "section" must mean what it says: Subsection (g) modifies *all* of § 1610.

Treating § 1610(g) as an independent basis for execution also creates superfluities in other parts of the statute. For example, subsections (a)(7) and (b)(3) of § 1610 relate specifically to judgments obtained under § 1605A, the current terrorism exception to jurisdictional immunity, and its predecessor, § 1605(a)(7). If subsection (g) paves a dedicated lane for all execution actions by victims of state-sponsored

terrorism, then § 1610(a)(7) and (b)(3) serve no purpose at all.[5]

In their reply brief, the plaintiffs seek refuge in our decision in *Gates*, which they say has already resolved this interpretive question in their favor. We disagree, though we can see how *Gates* might be read in that way. *Gates* involved a lien-priority contest between two sets of terrorism victims holding § 1605A judgments against Syria. 755 F.3d at 572–73. Both sets of victims—the "Gates plaintiffs" and the "Baker plaintiffs"—sought to execute on the same assets owned by Syrian instrumentalities but held by an American bank and a telecommunications company and located within the territorial jurisdiction of the Northern District of Illinois. *Id*. at 573–74. The dispute concerned compliance with the procedural requirements of § 1610(c). That subsection provides that

> [n]o attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

---

[5] Moreover, as we've noted, subsection (g) was enacted at the same time as § 1605A. In the same 2008 legislation, subsections (a)(7) and (b)(3) of § 1610 were amended to make the commercial-activity exceptions applicable to judgments obtained under § 1605A, the new exception to jurisdictional immunity for terrorism-related cases. If, as the plaintiffs claim, subsection (g) were a freestanding exception to execution immunity for § 1605A judgments, then these amendments—enacted at the same time—were completely unnecessary.

§ 1610(c). The cross-referenced provision establishes rules for obtaining a default judgment against a foreign state or its agency or instrumentality. 28 U.S.C. § 1608(e).

The Gates plaintiffs obtained a § 1610(c) order from the district court in the District of Columbia, where their judgment was entered, then registered the judgment in the Northern District of Illinois, where the assets of the Syrian instrumentality were located. A few days later, the Baker plaintiffs also registered their judgment in the Northern District of Illinois, but "[u]nlike the Gates plaintiffs, … [they] sought and obtained a new § 1610(c) order from the Northern District of Illinois." *Gates*, 755 F.3d at 574. The Baker plaintiffs then argued that their lien had priority because the Gates plaintiffs hadn't obtained a new § 1610(c) order in the Northern District of Illinois. The Gates plaintiffs responded with two arguments: First, "§ 1610(c) does not apply at all," and second, "even if it does, one order per judgment suffices for attachment and execution anywhere in the United States." *Id*. at 575.

The panel sided with the Gates plaintiffs, ruling in their favor on both grounds, either of which was independently sufficient to support the judgment. *Id*. at 578 ("For two independent reasons, then, § 1610(c) does not bar the priority of the Gates plaintiffs' liens … ."). Addressing the first argument, the panel noted that the Gates plaintiffs "are not seeking attachment under § 1610(a) or (b). They seek attachment under § 1610(g), which authorizes attachment of property of foreign state sponsors of terrorism and their agencies or instrumentalities to execute judgments under § 1605A for state-sponsored terrorism." *Id*. at 575. The panel continued: "Section 1610(g) is not mentioned in § 1610(c). By

its terms, then, § 1610(c) simply does not apply to execution or attachment under § 1610(g)." *Id*.

Alternatively, the panel held that "[e]ven if § 1610(c) applie[s] to attachment efforts under § 1610(g)," one order "suffices for attachment efforts throughout the United States." *Id*. at 577. The § 1610(c) order issued by the D.C. district court was thus sufficient; the Gates plaintiffs "were not required to seek a duplicative determination of the same question by the Northern District of Illinois before attaching the Syrian assets." *Id*. at 578.

Notably, *Gates* assumes rather than decides the crucial antecedent question—that is, whether § 1610(g) is itself a freestanding exception to execution immunity. Instead, it simply describes subsection (g) in a way that implies an affirmative answer. Perhaps that's not surprising; the issue was not developed by the parties. To be sure, the *Gates* opinion touches on the *Bancec* doctrine, observing that § 1610(g) "was intended to avoid limits the Supreme Court had imposed on the ability of litigants to attach the assets of foreign state agencies and instrumentalities." *Id*. at 576. And there's no doubt that the opinion *treats* § 1610(g) as if it *were* an independent exception to execution immunity, albeit without actually deciding the question. Indeed, that's the premise of the panel's holding that § 1610(c) does not apply.

But nowhere does the *Gates* opinion grapple with the fundamental interpretive question presented here. Instead, the parties and the court appear to have assumed without further inquiry that subsection (g) is an independent basis for attachment and execution for all terrorism-related judgments. Tellingly, there's no mention in *Gates* of the limiting phrase in subsection (g) "as provided in this section," nor

any reference to the statutory superfluities created by the broader interpretation advanced by the Rubin plaintiffs here.

A second appeal from the same attachment proceeding—this time involving a dispute between the Gates plaintiffs and the "Wyatt plaintiffs"—again found for the Gates plaintiffs but likewise neither raised nor decided the antecedent interpretive question. *See Wyatt v. Syrian Arab Republic*, 800 F.3d 331, 342–43 (7th Cir. 2015). The Wyatt plaintiffs mounted a collateral challenge to the § 1610(c) order that the Gates plaintiffs had obtained from the D.C. district court. *Id*. at 334–35, 342. The panel did not directly address this argument, relying instead on the holding of *Gates* that "'§ 1610(c) simply does not apply to the attachment of assets to execute judgments under § 1610(g) for state-sponsored terrorism.'" *Id*. at 343 (quoting *Gates*, 755 F.3d at 575). As in *Gates*, the opinion in *Wyatt* does not mention the fundamental interpretive question about the scope of § 1610(g). *Wyatt* thus left the unexamined premise of *Gates* unexamined.

In the meantime, the Ninth Circuit has been wrestling with the precise question presented here in a case involving assets of Bank Melli, an instrumentality of Iran. A panel of that court initially adopted the interpretation urged by the Rubin plaintiffs here—that § 1610(g) is a freestanding exception to execution immunity for terrorism-related judgments. *Bennett v. Islamic Republic of Iran*, 799 F.3d 1281, 1287 (9th Cir. 2015). Bank Melli petitioned for rehearing, and three weeks later the panel invited the views of the United States on the proper interpretation of § 1610(g). The United States responded, taking the same position it advances in this case. On February 22, 2016, the panel withdrew its earlier opinion and issued an amended one again holding that subsec-

tion (g) contains a freestanding exception to execution immunity. *Bennett v. Islamic Republic of Iran*, 817 F.3d 1131, 1141 (9th Cir. 2016). Judge Benson disagreed with the majority's interpretation of subsection (g) and filed a partial dissent on that issue. *Id*. at 1149–51. The panel expressly invited Bank Melli to file another petition for panel and en banc rehearing. *Id*. at 1136.

Bank Melli did so, and on June 14, 2016, the panel issued a second amended opinion. *See Bennett v. Islamic Republic of Iran*, Nos. 13-15442 & 13-16100, 2016 WL 3257780 (9th Cir., June 14, 2016). The majority reaffirmed its earlier conclusion that "subsection (g) contains a freestanding provision for attaching and executing against assets of a foreign state or its agencies or instrumentalities." *Id*. at *6. Judge Benson again dissented. *Id*. at *11–14. With this latest decision, the Ninth Circuit appears to be done with the case; the panel's order indicates that no judge requested a vote on Bank Melli's petition for en banc rehearing. *Id*. at *2.

The *Bennett* majority purported to explain away the "as provided in this section" language in subsection (g) by interpreting it to apply only to § 1610(f). *Id*. at *6 ("When subsection (g) refers to attachment and execution of the judgment 'as provided in this section,' it is referring to procedures contained in § 1610(f)."). That strikes us as a highly strained interpretation. First, as we've already noted, it implausibly reads the word "section" as "*sub*section," so the phrase "as provided in this section" actually means "as provided in *sub*section (f)."

Second, and importantly, § 1610(f) *never became operative*. It was adopted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L.

No. 105-277, § 117, 112 Stat. 2681, 2681-491 (1998), and pertains to execution on property associated with certain regulated and prohibited financial transactions. Congress originally authorized the President to waive subsection (f)'s provisions "in the interest of national security." *Id*. § 117(d), 112 Stat. at 2681-492. President Clinton immediately issued a blanket waiver. Presidential Determination No. 99-1, 63 Fed. Reg. 59,201 (Oct. 21, 1998). Congress briefly repealed the President's waiver authority in the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 2002(f)(2), 114 Stat. 1464, 1541, 1543, but quickly restored it, *id*. § 2002(f)(1)(B), 114 Stat. at 1543, codifying the Executive's waiver authority in 28 U.S.C. § 1610(f)(3): "The President may waive any provision of paragraph (1) in the interest of national security." President Clinton issued another blanket waiver that same day. Presidential Determination No. 2001-03, 65 Fed. Reg. 66,483 (Oct. 28, 2000).

So subsection (f), being inoperative from the start, does not allow *any* form of execution. Congress enacted subsection (g) just eight years later. If the Ninth Circuit's reasoning is correct, subsection (g) was effectively a nullity upon passage. That cannot be the correct interpretation. *See Voisine v. United States*, No. 14-10154, 2016 WL 3461559, at *6 (U.S., June 27, 2016) (explaining that Congress is presumed to legislate against the backdrop of the "known state of the laws" (quoting *United States v. Bailey*, 34 U.S. (9 Pet.) 238, 256 (1835))). It therefore makes no sense to say, as the *Bennett* majority does, that the phrase "as provided in this section" in subsection (g) refers only to subsection (f), an inoperative part of the statute. If that were the case, then execution "as provided in this section" would mean no execution at all.

For these reasons, we disagree with the Ninth Circuit's interpretation of subsection (g). We note that the *Bennett* majority drew support for its conclusion from our decisions in *Gates* and *Wyatt*, apparently reading them as the plaintiffs do here. *See Bennett*, 2016 WL 3257780, at *7. That's understandable for the reasons we've already explained. To the extent that *Gates* and *Wyatt* can be read as holding that § 1610(g) is a freestanding exception to execution immunity for terrorism-related judgments, they are overruled.[6]

To summarize: Section 1610(g) is not itself an exception to execution immunity for terrorism-related judgments; rather, it abrogates the *Bancec* rule for terrorism-related judgments. Accordingly, terrorism victims with unsatisfied § 1605A judgments against foreign states may execute on the foreign state's property *and* the property of its agency or instrumentality—without regard to the *Bancec* presumption of separateness—but they must do so "as provided in this section." § 1610(g). That is, they must satisfy an exception to execution immunity found elsewhere in § 1610—namely, subsections (a) or (b).

---

[6] Because this opinion overrules circuit precedent and creates a conflict with the Ninth Circuit, it has been circulated to all judges in active service in accordance with Circuit Rule 40(e). Chief Judge Wood and Circuit Judges Posner, Flaum, Easterbrook, and Rovner did not participate, so a majority did not vote to rehear this case en banc. Circuit Judge Hamilton has filed a dissent from the denial of en banc review, which is attached to this opinion.

### E. The Terrorism Risk Insurance Act

Finally, the plaintiffs argue that the Persepolis Collection is subject to attachment and execution under section 201(a) of TRIA, which permits a person who holds a judgment against a state sponsor of terrorism to execute on the foreign state's assets (and those of certain agencies and instrumentalities) if the assets have been blocked by executive order under certain international sanctions provisions. Pub. L. No. 107-297, § 201(a), 116 Stat. 2322, 2337 (2002). An asset is deemed to be blocked when it has been "seized or frozen" by the United States under section 5(b) of the Trading with the Enemy Act or under sections 202 or 203 of the International Emergency Economic Powers Act. *Id.* § 201(d)(2)(A), 116 Stat. at 2339.

In response to the 1979 Iran hostage crisis, President Carter invoked his authority under the International Emergency Economic Powers Act and issued Executive Order 12170, which froze all Iranian assets in the United States. Exec. Order No. 12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979). The hostage crisis was resolved in 1981 with the Algiers Accords, and in accordance with commitments made in that agreement, President Carter issued Executive Order 12281, which unblocked all uncontested property interests of the Iranian government. Exec. Order No. 12281, 46 Fed. Reg. 7923 (Jan. 19, 1981). The order gave implementing authority to the Treasury Department. *Id*. at 7924. The Treasury Department's Office of Foreign Assets Control issued regulations broadly defining unblocked property as "all uncontested and non-contingent liabilities and property interests of the Government of Iran, its agencies, instrumentalities, or controlled entities." 31 C.F.R. § 535.333(a). A property inter-

est is considered "contested only if the holder thereof reasonably believes that Iran does not have title or has only partial title to the asset," and a belief is considered reasonable "only if it is based on a bona fide opinion, in writing, of an attorney licensed to practice within the United States stating that Iran does not have title or has only partial title to the asset." *Id.* § 535.333(c).

There's no evidence that the University contests Iran's title to the Persepolis Collection. To the contrary, the University has reaffirmed the terms of the long-term academic loan, which unambiguously requires it to return the artifacts to Iran when study is complete. Nor has the University sought or obtained an attorney's opinion that Iran lacks title or has only partial title to the artifacts.

The plaintiffs argue that the Persepolis Collection remains a blocked asset subject to execution because the University asserted in a June 2004 district-court filing that it maintained a "superseding possessory right." But no one disputes that the University has a present *possessory interest* in the Persepolis Collection. Iran nonetheless retains full *ownership*. The plaintiffs place great emphasis on the fact that Iran has periodically inquired about the progress of the study and has occasionally requested the return of the artifacts. That simply reinforces the University's present possessory interest; it's not evidence of contested title.

Alternatively, the plaintiffs claim that the artifacts have been "reblocked" by President Obama's Executive Order 13599. 77 Fed. Reg. 6659, 6659 (Feb. 8, 2012). But section 4(b) of this order expressly exempts all "property and interests in property of the Government of Iran that were blocked pursuant to Executive Order 12170 of November 14, 1979,

and thereafter made subject to the transfer directives set forth in Executive Order 12281 of January 19, 1981." *Id.* at 6660.

The plaintiffs argue that "transfer directives" means a directive from Iran, and because Iran has never directed that these particular artifacts be transferred to it, the exception in section 4(b) doesn't apply to the Persepolis Collection. This argument misreads the 2012 order, which refers to "transfer directives set forth in" President Carter's 1981 Executive Order that all property meeting certain specified criteria be returned to Iran. That is, the directive is categorical rather than contingent on a particularized demand by Iran.

Accordingly, the district judge was right to conclude that attachment and execution under section 201 of TRIA is unavailable.

AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting from denial of en banc review. The panel opinion in *Rubin v. Islamic Republic of Iran*, No. 14-1935, both creates a circuit split and overrules, in part, two recent decisions of this court. Either step by itself would ordinarily trigger our Circuit Rule 40(e), which requires circulation within the court before publication to see if a majority of active judges wish to rehear the case en banc.

In this case, a majority of active judges do not even have the opportunity to vote. A majority are disqualified, so it is impossible to hear this case en banc. In this rare situation, the panel apparently has the *power* to overrule circuit precedent and to create a circuit split without meaningful Rule 40(e) review. Yet that step is a mistake that should not go without comment. Also, most Rule 40(e) decisions settle the legal issue in the circuit. In this rare situation, one panel's decision to overrule another's decisions should not be treated as settling the legal issue in this circuit. I respectfully dissent.

The issue is whether a provision of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1610(g), offers a freestanding basis for executing judgments against state sponsors of terrorism, independent of § 1610(a) and (b). As dry and technical as that sounds, the issue has important practical consequences for victims of state-sponsored terrorism. Most important, the *Rubin* panel's view restricts execution to foreign sovereign assets that are used: (a) by the foreign sovereign itself, (b) for a commercial activity, and (c) in the United States. That reading shelters from execution a wide range of assets of state sponsors of terrorism, such as the museum collection here.

If, on the other hand, § 1610(g) offers a freestanding basis for execution, then victims are not limited to property the sovereign uses commercially in the United States. Victims of state-sponsored terrorism may execute judgments against a broader range of foreign sovereign assets. That's the view of the Ninth Circuit in *Bennett v. Islamic Republic of Iran*, — F.3d —, — & nn. 4–7, 2016 WL 3257780, at *6–7 & nn. 4–7 (9th Cir. 2016), which held that § 1610(g) provides a freestanding basis for executing judgments for state-sponsored terrorism. That reading should enable the plaintiffs in *Bennett* to execute on assets that were not used commercially in the United States. See *id*. at *4 (cash in United States that was owed to Iranian state bank for use of credit cards in Iran). That same reasoning would extend to the museum collection at issue here.

Whether § 1610(g) provides a freestanding basis also affects the procedures that victims of state-sponsored terrorism must follow to execute their judgments. We dealt with procedural issues in both *Wyatt v. Syrian Arab Republic*, 800 F.3d 331, 342–43 (7th Cir. 2015), and *Gates v. Syrian Arab Republic*, 755 F.3d 568, 575–77 (7th Cir. 2014) (alternative holding). In both cases, we adopted the view that § 1610(g) is freestanding, which broadens the rights of victims v. state sponsors of terrorism, while still assuring due process of law.

The details of the textual arguments are laid out well in *Bennett* and *Rubin*, and I will not repeat them. Both readings of the text, I believe, are reasonable, meaning that the text is ambiguous. The courts must choose between two statutory readings: one that favors state sponsors of terrorism, and another that favors the victims of that terrorism.

The FSIA contains detailed protections for foreign governments in most civil litigation. But over the years, Congress has

added special provisions for cases of state-sponsored terrorism, including the addition of § 1610(g) as part of § 1083 of Public Law 110-181, the National Defense Authorization Act for Fiscal Year 2008. Those special provisions, including § 1610(g), work together to make it easier for victims of state-sponsored terrorism to pursue foreign sovereign assets in the United States. In 2008, Congress even took the unusual step of applying the new provisions to pending cases. P.L. 110-181, § 1083(c). See also *Bennett*, 2016 WL 3257780, at *8 (legislative history of 2008 amendments shows broad intent to facilitate execution of judgments against *any* property owned by state sponsors of terrorism).

I recognize that "no legislation pursues its purposes at all costs," and that it "frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). But in interpreting an ambiguous statutory text, we can and should draw on statutory purpose and legislative history. We must choose one side or the other. The balance here should weigh in favor of the reading that favors the victims. We should not attribute to Congress an intent to be so solicitous of state sponsors of terrorism, who are also undeserving beneficiaries of the unusual steps taken by the *Rubin* panel.

We should continue to follow *Gates* and *Wyatt*, and we should avoid creating a conflict with *Bennett*, especially in a case where the en banc court cannot act. We should allow the *Rubin* plaintiffs to pursue broader categories of Iranian property, including the Persepolis Collection at the University of Chicago.