*Cayuga Indian Nation of New York v. Seneca County*

In the

# United States Court of Appeals
## For the Second Circuit

August Term, 2019

(Argued: January 7, 2020  Decided: October 23, 2020)

Docket No. 19-0032

CAYUGA INDIAN NATION OF NEW YORK,

*Plaintiff–Counter-Defendant–Appellee,*

–v.–

SENECA COUNTY, NEW YORK,

*Defendant–Counter-Claimant–Appellant.*

B e f o r e :

KEARSE, CALABRESI, and CARNEY, *Circuit Judges.*

Seneca County, New York, appeals from a December 11, 2018 decision of the United States District Court for the Western District of New York (Siragusa, *J.*), granting summary judgment in favor of the Cayuga Indian Nation of New York and permanently enjoining the County from foreclosing on the Cayuga Indian Nation's real property for nonpayment of taxes. We agree with the District Court that tribal sovereign immunity from suit bars the County from pursuing tax enforcement actions

under Article 11 of the New York Real Property Tax Law against the Cayuga Indian Nation. Contrary to the County's view, its foreclosure proceedings are not permitted by the traditional common law exception to sovereign immunity that covers certain actions related to immovable property. We also reject the County's reading of *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), as abrogating a tribe's immunity from suit. Accordingly, we **AFFIRM** the judgment of the District Court.

      **AFFIRMED**.

———————

DAVID W. DEBRUIN (Zachary C. Schauf, Caroline C. Cease, *on the brief*), Jenner & Block LLP, Washington, DC; Daniel J. French, Lee Alcott (*on the brief*), Barclay Damon, LLP, Syracuse, NY, *for Plaintiff–Counter-Defendant–Appellee Cayuga Indian Nation of New York*.

LOUIS P. DILORENZO (Brian Laudadio, Mary P. Moore, *on the brief*), Bond, Schoeneck & King, PLLC, New York & Rochester, NY, *for Defendant–Counter-Claimant–Appellant Seneca County, New York*.

———————

CARNEY, *Circuit Judge*:

This appeal poses the question whether a federally recognized Indian tribe's sovereign immunity from suit prevents a county in New York State from foreclosing on tribal properties within the county's borders for the nonpayment of real estate taxes.

In 2007, the Cayuga Indian Nation of New York (the "Cayuga Nation," the "Cayugas," or the "Tribe") purchased several parcels of land located in Seneca County, New York (the "Properties"). After the Cayugas refused to pay real property taxes levied by Seneca County (the "County") on the Properties, the County in 2010 initiated foreclosure proceedings (the "Foreclosure Actions") under Article 11 of the New York Real Property Tax Law ("Article 11"). In response, the Cayugas sued the County in federal district court, asserting (among other claims) that the Foreclosure Actions were

2

barred by the doctrine of tribal sovereign immunity from suit. The United States District Court for the Western District of New York (Siragusa, *J.*) agreed with the Cayuga Nation, ruling in its favor on the parties' cross-motions for summary judgment and enjoining the County from proceeding with the Foreclosure Actions.

In this appeal, Seneca County argues in principal part that the Foreclosure Actions may proceed under an "immovable-property exception" to tribal sovereign immunity from suit. At common law, the County asserts, a sovereign (*e.g.*, France) would not be immune from legal actions that challenged the sovereign's rights to real (*i.e.*, immovable) property located outside that sovereign's own territory (*e.g.*, in the United States). The County urges us to recognize an analogous exception here to the general rule of tribal sovereign immunity from suit, reasoning that the scope of the immunity to which indigenous tribes are entitled cannot exceed that enjoyed at common law by other sovereigns. On this basis, Seneca County contends, the Foreclosure Actions are permitted.

We need not reckon with the merits of that position, however, because we conclude that, even were we to recognize the County's proposed exception to immunity, the Foreclosure Actions lie outside its bounds. As we explain below, the Foreclosure Actions do not seek to establish Seneca County's *rights* in real estate such as are the animating concern of the immovable-property exception. Rather, because in the Foreclosure Actions the County seeks to seize the Properties as a *remedy* for the nonpayment of taxes, the proceedings are best seen as the functional equivalent of an action to execute on a money judgment. Viewed accordingly, they lie well within the categories of suits from which sovereigns were traditionally immune under the common law, and the existence or not of an immovable-property exception to tribal sovereign immunity is of no moment.

3

We also reject the County's interpretation of *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) ("*Sherrill*"), as wholesale authorization for state tax foreclosure actions against tribes. We have previously considered and discarded that reading of *Sherrill* in two decisions: *Oneida Indian Nation of New York v. Madison County*, 605 F.3d 149 (2d Cir. 2010) ("*Oneida I*"), *vacated and remanded sub nom. Madison County v. Oneida Indian Nation of New York*, 562 U.S. 42 (2011), and *Cayuga Indian Nation of New York v. Seneca County*, 761 F.3d 218 (2d Cir. 2014) ("*Cayuga I*") (preliminary injunction decision). While, as a technical matter, neither opinion's interpretation of *Sherrill* binds our ruling here, we agree with the reasoning consistently adopted in those two decisions. We therefore finally put to rest the misguided claim that *Sherrill* abrogated a tribe's sovereign immunity from suit. Read properly, it merely narrowed the scope of tribal immunity from certain forms of state regulation.

For these reasons, and as set forth more fully below, we AFFIRM the judgment of the District Court.

## BACKGROUND

The factual background relevant to this appeal is undisputed and was established by the parties in their summary judgment submissions.

The Cayuga Nation is an Indian tribe recognized by the United States government. In 2007, the Cayugas purchased the Properties, comprising five parcels of land located within the boundaries of Seneca County, in upstate New York.[1] The Tribe refused to pay the related real property taxes levied by the County, however, taking the position that the Properties lay in "Indian country" within the meaning of federal

---

[1] During the state foreclosure proceedings, the five parcels that constitute the Properties were reconfigured as four separate parcels.

4

law.[2] App'x 13.[3] In due course, the Cayugas' unpaid tax bill resulted in the imposition of liens against the Properties by operation of Article 11 of the New York Real Property Tax Law, the state statutory scheme governing the County's collection of real property taxes. *See Oneida Indian Nation of N.Y. v. Madison Cty.*, 665 F.3d 408, 429-30 (2d Cir. 2011) ("*Oneida II*") (reviewing "the default tax-enforcement procedure established by Article 11"). Then, in October 2010, Seneca County moved under Article 11 to foreclose on the liens and seize the underlying Properties in satisfaction of the Cayugas' tax debt.

As noted above, the Cayugas proceeded to sue the County in federal district court, seeking to enjoin the foreclosure proceedings. The Tribe maintained that New York law exempts their lands from state and local taxation, and that the Foreclosure Actions are also barred by tribal sovereign immunity and the federal Nonintercourse Act, 25 U.S.C. § 177.[4]

---

[2] As we have explained elsewhere,

> "Indian country" is . . . statutorily defined as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

*Citizens Against Casino Gambling in Erie Cty. v. Chaudhuri*, 802 F.3d 267, 280 (2d Cir. 2015) (quoting 18 U.S.C. § 1151).

[3] Unless otherwise noted, this Opinion omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

[4] The Nonintercourse Act (the "Act") generally "bars sales of tribal land without the acquiescence of the Federal Government." *Sherrill*, 544 U.S. at 204. In connection with their claim under the Act, the Cayugas assert that the Properties lie within the historical boundaries of a 64,000-acre federal reservation that the Treaty of Canandaigua established in 1794 for their

In August 2012, the District Court entered a preliminary injunction halting the Foreclosure Proceedings based entirely on the Tribe's claim of sovereign immunity from suit. In doing so, it relied heavily on our analysis in *Oneida I*, where we held that "the long-standing doctrine of tribal sovereign immunity" precluded New York counties from pursuing "[t]he remedy of foreclosure" against tribes that refuse to pay property taxes. 605 F.3d at 151. The Supreme Court vacated our *Oneida I* decision when, after the Court granted certiorari, the tribe expressly waived its sovereign immunity in that proceeding. *See Madison Cty. v. Oneida Indian Nation of New York*, 562 U.S. at 42.[5] Nonetheless, the District Court found persuasive the reasoning we had adopted in the vacated decision, concluding on grounds similar to those we cited there that the Foreclosure Actions were very likely barred by the Tribe's sovereign immunity from suit, justifying an award of preliminary relief to the Tribe.

The County appealed, invoking our interlocutory jurisdiction. In July 2014, a panel of this Circuit affirmed the District Court's order. *See Cayuga I*, 761 F.3d at 221. In a brief opinion, we declined to express a view as to the substantive import of the

---

tribe. Although in 1795 and 1807 they sold most of this land to the State of New York, the Cayugas allege in their complaint that the absence of Congressional approval for the sales rendered the transactions void and violative of the Nonintercourse Act, a position that, the Cayugas argue in a recent submission to the Court, is supported by the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020). For its part, Seneca County disputes that the Treaty of Canandaigua established a reservation for the Cayugas in the first place.

[5] While review of *Oneida I* was pending in the Supreme Court, the Oneida Indian Nation "passed a tribal declaration and ordinance waiving its sovereign immunity to enforcement of real property taxation through foreclosure by state, county and local governments within and throughout the United States." *Madison Cty. v. Oneida Indian Nation of N.Y.*, 562 U.S. at 42. In light of this "new factual development," the Supreme Court vacated our judgment in a brief order and remanded for further proceedings. *Id.* On remand, we found that the tribe's express waiver compelled the conclusion that sovereign immunity no longer barred the counties' tax enforcement actions; the appeal was then resolved on other grounds. *See Oneida II*, 665 F.3d at 414-15.

Supreme Court's vacatur of *Oneida I*. *See id.* at 220. Instead, based on an independent review of the relevant law, our per curiam opinion simply reaffirmed *Oneida I*'s conclusion that federally recognized tribes are immune from local tax foreclosure actions, *see id.* at 220-21, and therefore that the District Court did not abuse its discretion by entering preliminary injunctive relief.

Following remand, the parties cross-moved for summary judgment, and on December 11, 2018, the District Court ruled in favor of the Cayugas. Relying principally on its earlier preliminary injunction ruling and our interlocutory decision in *Cayuga I*, the District Court concluded that tribal sovereign immunity from suit prevented Seneca County from foreclosing on the Properties. It therefore granted the declaratory and permanent injunctive relief that the Cayugas requested and dismissed their remaining claims as moot. The County then filed this timely appeal.

**DISCUSSION**

We review *de novo* a district court's grant of summary judgment, "construing the evidence in the light most favorable to the non-moving party." *CIT Bank N.A. v. Schiffman*, 948 F.3d 529, 532 (2d Cir. 2020). A district court may award summary judgment "only if the court concludes that the case presents no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Morgan v. Dzurenda*, 956 F.3d 84, 88 (2d Cir. 2020).

Seneca County advances two main contentions on appeal. First, it asserts that an "immovable-property exception" to sovereign immunity permits the Foreclosure Actions. Generally speaking, this exception refers to a common law doctrine that curtails sovereign immunity in legal actions contesting a sovereign's rights or interests in real property located within another sovereign's territory. Second, the County urges

7

that the Supreme Court's decision in *Sherrill* ended tribal sovereign immunity altogether in tax foreclosure actions.

Below, we consider these arguments in turn. At the threshold, however, we briefly address whether *Cayuga I* controls this appeal—a position pressed by the Cayugas, who insist that it does because the County raises in this appeal the very arguments that we considered and rejected in *Cayuga I*.

The Cayugas' view is incorrect. We resolved *Cayuga I* on interlocutory appeal of a preliminary injunction, a distinctive procedural posture. We long ago observed that, "[o]rdinarily, findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998). This is because a preliminary injunction order is, by its very nature, "tentative." *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 274 (2d Cir. 1992). To secure preliminary injunctive relief, a plaintiff must show "a likelihood of success on the merits"—it need not achieve "*actual* success." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) (emphasis added). As we explained in *Goodheart Clothing*, "[i]t would . . . be anomalous at least in most cases, and here, to regard the initial [preliminary injunction] ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions." 962 F.2d at 274.

Two additional considerations reinforce the correctness of this conclusion. First, in *Cayuga I*, we did not explicitly address Seneca County's immovable-property argument, and as a general practice, we avoid relying on "implicit holding[s]." *Villanueva v. United States*, 893 F.3d 123, 131 (2d Cir. 2018) (citing *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Second, we think that the Supreme Court's decision in *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649 (2018) ("*Upper Skagit*"), weighs in favor of treating the County's invocation of the immovable-property exception as presenting an

8

as-yet unresolved question of law. In *Upper Skagit*, which the Supreme Court decided after we issued our opinion in *Cayuga I*, neighboring landowners filed an adverse possession action against the Upper Skagit Tribe, seeking to quiet title to a disputed strip of land as to which both groups lay claim. *Upper Skagit*, 138 S. Ct. at 1652. The Washington State Supreme Court initially ruled against the tribe, but the landowners later conceded that the state court's decision rested on an erroneous interpretation of *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251 (1992). *See Upper Skagit*, 138 S. Ct. at 1652-53. The landowners nevertheless urged the United States Supreme Court to affirm the state court's judgment based on the immovable-property exception to sovereign immunity. *Id.* at 1654.

The Supreme Court declined to address this proposed alternative ground for affirmance, choosing instead to direct the state court to consider the immovable-property exception (presumably, both its definition and application) in the first instance. *See id.* At the same time, four of the Justices signaled their willingness to embrace recognition of such an exception to tribal immunity from suit. In dissent, Justices Thomas and Alito expressed the view that an immovable-property exception— which they described as having been "hornbook law almost as long as there have been hornbooks"—"plainly extends to tribal immunity, as it does to every other form of sovereign immunity." *Id.* at 1657 (Thomas, *J.*, dissenting). For their part, Chief Justice Roberts and Justice Kennedy identified concerns about applying tribal immunity from suit to "property disputes of this sort," writing that, "if it turns out that the [immovable-property exception] does not extend to tribal assertions of rights in non-trust, non-reservation property, the applicability of sovereign immunity in such circumstances would . . . need to be addressed in a future case." *Id.* at 1655-56 (Roberts, *C.J.*, concurring).

In light of these considerations, we do not think that our decision in *Cayuga I* compels us to affirm the District Court's judgment. Rather, we do so for the reasons stated below.

## I.      The Immovable-Property Exception

As "domestic dependent nations," federally recognized tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014). Courts must avoid "carving out exceptions" to that immunity and should take care not to restrict tribes' historic immunity from suit. *Id.* at 789-90; *cf. Lewis v. Clarke*, 137 S. Ct. 1285, 1293 (2017) (cautioning against "extend[ing] sovereign immunity for tribal employees beyond what common-law sovereign immunity principles would recognize for either state or federal employees"). The power to restrict the scope of a tribe's immunity from suit lies, instead, with Congress (which is empowered to authorize suits against tribes) and with the tribes themselves (which may waive their immunity from suit, as occurred in *Oneida II*, 665 F.3d at 414). *See Bay Mills*, 572 U.S. at 788.

Seneca County contends that the common law has long recognized an exception to state and foreign sovereign immunity in certain cases involving real property. The County urges us to find an analogous exception to tribal sovereign immunity, warning that a contrary holding would "confer[] super-sovereign authority to the Cayuga Nation." Appellant's Br. 14.

To resolve this appeal, however, we need not rule on the existence of such an exception to tribal immunity. This is because, as discussed below, we conclude that the Foreclosure Actions fall outside the purview of the common law version of the immovable-property exception. Otherwise said: even if the County is correct that an immovable-property exception limits tribal sovereign immunity from suit, that

10

exception provides no basis for disturbing the District Court's judgment and allowing the Foreclosure Actions to proceed.

American common law has long recognized an "exception to sovereign immunity for actions to determine rights in immovable property." *Upper Skagit*, 138 S. Ct. at 1655 (Roberts, *C.J.*, concurring); *see also City of New York v. Permanent Mission of India to the United Nations*, 446 F.3d 365, 374 (2d Cir. 2006) ("*Permanent Mission of India I*") ("This principle . . . long predated the restrictive theory of sovereign immunity and the [Foreign Sovereign Immunities Act]."). This rule—which has developed primarily in the context of international law and practice—derives from two basic aspects of sovereign authority.[6] The first is that "property ownership is not an inherently sovereign function." *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007) ("*Permanent Mission of India II*"). Thus, when a state acquired land outside of its own territory, courts traditionally treated that land as if it were owned by a private individual. *See Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 145 (1812) ("A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction, he may be considered as so far laying down the prince, and assuming the character of a private individual.").

---

[6] As noted in the text of this Opinion, questions regarding the applicability of the immovable-property exception have to date arisen most often in the context of suits against foreign sovereigns. *See Upper Skagit*, 138 S. Ct. at 1657-60 (Thomas, *J.*, dissenting) (tying the emergence of the exception to international law and practice); *see also* Restatement (Fourth) of Foreign Relations Law of the United States § 456, reporters' n.2 (Am. Law Inst. 2018) (collecting cases applying the exception to foreign sovereigns). The Supreme Court has recognized and applied an analogous exception, however, in suits against the states. *See Upper Skagit*, 138 S. Ct. at 1655 (Roberts, *J.*, concurring); *see also Georgia v. City of Chattanooga*, 264 U.S. 472, 480-482 (1924).

The second is that each state has "a primeval interest in resolving disputes over use or right to use of real property" located within its own territory. *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1521 (D.C. Cir. 1984) (Scalia, *J.*). Land is "indissolubly connected with the territory of a [s]tate," *Upper Skagit*, 138 S. Ct. at 1658 (Thomas, *J.*, dissenting); the boundaries of a state's territory, in turn, generally limit the reach of the state's sovereign powers, *see The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824) ("The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens."). A state therefore "cannot safely permit the title to its land to be determined by a foreign power." *Asociacion de Reclamantes*, 735 F.2d at 1521 (quoting 1 F. Wharton, Conflict of Laws § 278, at 636 (3d ed. 1905)).

In keeping with these principles, courts and other authorities have generally understood the immovable-property exception as permitting only those lawsuits against a sovereign that "contest[]" its rights or interests in real property. Restatement (Second) of Foreign Relations Law of the United States § 68 cmt. d (Am. Law Inst. 1965).[7] Accordingly, the exception has not been thought to eliminate the immunity defense as to "disputes that arise out of [a foreign sovereign's] rights in real estate but do not actually place [those rights] at issue." *Permanent Mission of India I*, 446 F.3d at 369.[8] Nor has it been applied when the party who invokes the exception "makes no

---

[7] Different articulations of the immovable-property exception have found favor over the years. *Compare* Restatement (Second) of Foreign Relations Law § 68(b) (the exception covers "action[s] to obtain possession of or establish a property interest in immovable property located in the territory of the State exercising jurisdiction"), *with Permanent Mission of India I*, 446 F.3d at 375 (the exception covers "disputes directly implicating property interests or rights to possession"). As discussed in the text of this Opinion, however, all of the various articulations of the exception center on actions asserting claims to rights or interests in real property that compete with those of the sovereign.

[8] In many of these cases, courts looked to the common law immovable-property exception to help them interpret the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. § 1602

claim to any interest" in a foreign sovereign's real property and is "not seeking to establish any rights" in that property. *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987). Instead, the immovable-property exception has reached only those disputes that require the court to resolve competing claims to a right or interest in real property. *See* Restatement (Second) of Foreign Relations Law § 68 cmt. d (describing the exception as covering "actions for the determination of possession of, or an interest in, immovable or real property located in the territory of a state exercising jurisdiction").

Thus, for example, the exception plainly applies to, and allows, a state's eminent-domain proceedings against a foreign state's property located in the state exercising eminent domain. *Permanent Mission of India II*, 551 U.S. at 200. In such proceedings, the parties assert conflicting rights to land. *See Chattanooga*, 264 U.S. at 480 (describing the state's right of eminent domain as "superior to property rights" and as "extend[ing] to all property with the jurisdiction of the State"); *see also Kohl v. United States*, 91 U.S. 367, 371 (1875) (making a similar point). The exception has also been held to cover and permit lawsuits seeking to establish "the validity of [a city's] tax liens on property held by [a foreign] sovereign." *Permanent Mission of India II*, 551 U.S. at 195. In such cases, an interest in property—*i.e.*, the existence of a valid lien on real estate—is in dispute.

In contrast, courts have concluded that the immovable-property exception does not extend to lawsuits against a foreign sovereign that: (1) arise out of a slip-and-fall injury occurring on the foreign sovereign's land, *id.* at 200; (2) seek damages and injunctive relief on the theory that building renovations on the foreign sovereign's

---

*et seq.*, the statute that now "governs federal courts' jurisdiction in lawsuits against foreign sovereigns." *Permanent Mission of India II*, 551 U.S. at 195. This is because, in enacting the FSIA, Congress intended "to codify the pre-existing real property exception to sovereign immunity recognized by international practice." *Id.* at 200; *see also infra* p. 16-17.

property depreciated the value of neighboring lands, *MacArthur Area Citizens Ass'n*, 809 F.2d at 919, 920-21; or (3) seek monetary compensation from the foreign sovereign in connection with the expropriation of real property located in the United States, *Asociacion de Reclamantes*, 735 F.2d at 1519, 1520-24. Those types of disputes may "arise out of . . . rights in real estate," but they all fall short of "actually plac[ing] [those rights] at issue." *Permanent Mission of India I*, 446 F.3d at 369.

Turning back to Seneca County, we conclude that the Foreclosure Actions fall outside the ambit of the common law exception to sovereign immunity for matters involving immovable property. Although a foreclosure action certainly involves real property, the Cayuga Nation observes—and we are convinced—that these "tax enforcement actions are—fundamentally—about money, not property." Appellee's Br. 32. In commencing the Foreclosure Actions under Article 11, Seneca County does not seek a court determination that its tax liens against the Properties are valid. *See Oneida II*, 665 F.3d at 430 (observing that, under Article 11, "unpaid taxes and other assessments automatically become a lien against the property" after a certain period of time has passed). Nor does the County challenge the legitimacy of the Cayugas' existing rights or interests in those Properties. Rather, Seneca County invokes its tax-collection powers to seize the Properties under Article 11 as satisfaction for the Cayugas' financial debt for accrued, unpaid property taxes.

True, if Seneca County prevailed in the Foreclosure Actions, it would acquire title to the Properties. *See Kennedy v. Mossafa*, 100 N.Y.2d 1, 8 (2003) (explaining that, under Article 11, "the court enters a judgment directing that title pass in fee simple absolute to the county"). That transfer of title, however, would simply serve as a *remedy*—a way to satisfy the Tribe's tax debt. Thus, contrary to the County's urging, we do not view the Foreclosure Actions as "actions *to determine* rights in immovable property." *Upper Skagit*, 138 S. Ct. at 1655 (Roberts, *C.J.*, concurring) (emphasis added).

14

Rather, we see them as actions to pursue a remedy that is available to Seneca County by virtue of its rights in immovable property. Accordingly, the Foreclosure Actions are not covered by the immovable-property exception to sovereign immunity as it has been recognized at common law.

We find additional support for our conclusion in the Restatement (Second) of Foreign Relations Law of the United States (Am. Law Inst. 1965). Courts have regularly consulted this edition of the Restatement when faced with ascertaining the scope of the common law exception to sovereign immunity for immovable property. *See, e.g.*, *Permanent Mission of India II*, 551 U.S. at 200; *Permanent Mission of India I*, 446 F.3d at 372. In comment (d) of section 65, which generally addresses the "[i]mmunity of foreign state[s] from jurisdiction to enforce tax laws," the Restatement reports that (as of that writing) "no case has been found in which the property of a foreign government has been subject to foreclosure of a tax lien or a tax sale." Restatement (Second) of Foreign Relations Law § 65 cmt. d. This void, the Restatement explains, arises because although "particular types of property of foreign governments may be carried on the tax rolls and be made the subjects of levy and assessment," the common law immunities enjoyed by foreign sovereigns "prevent[] the actual enforcement against the property of a foreign state of a tax claim of the territorial state." *Id.*

Seneca County attempts to downplay the significance of comment (d)'s report by suggesting that it "relates only to tax liability arising from ownership of movable property by a foreign sovereign, not tax liability from ownership of immovable property." Appellant's Br. 25. The Restatement does not expressly acknowledge any such limitation, however, and we see no reason to infer one. In any event, the County identifies no case before or since the Restatement issued in which a court in the United

States has applied the common law exception for immovable property to permit the foreclosure of a foreign sovereign's real property for nonpayment of taxes.[9]

Seneca County's failure to produce such a case is telling, but hardly surprising. Until the middle of the 20th century, the United States afforded foreign sovereigns "absolute immunity" from the execution of judgments against their properties located in this country. *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1233 (2d Cir. 1995); *see also* Restatement (Fourth) of Foreign Relations Law of the United States § 464 reporters' n.1 (Am. Law Inst. 2018) ("Prior to the enactment of the FSIA, the United States gave absolute immunity to foreign sovereigns from the execution of judgments.").[10] Thus, "[e]ven if a court acquired jurisdiction and awarded judgment

---

[9] In support of its contrary position, Seneca County relies primarily on authorities that we find inapposite: (1) cases and scholarly works that restate the immovable-property exception in general terms; (2) cases in which rights to real property were actually in dispute, *see, e.g.*, *Chattanooga*, 264 U.S. at 472 (eminent-domain proceeding), *Permanent Mission of India II*, 551 U.S. at 195 (lawsuit contesting validity of tax lien); (3) cases that concern doctrines other than the immovable-property exception to sovereign immunity, *see, e.g.*, *State v. City of Hudson*, 231 Minn. 127, 128, 42 N.W.2d 546, 547 (1950) (applying state constitutional provision); *see also, e.g.*, *City Council of Augusta v. Timmerman*, 233 F. 216, 218 (4th Cir. 1916) (applying the rule that "courts will not interfere by injunction with the collection of the public revenue, on the ground that a tax is illegal, unless it clearly appears that the complainant has no adequate legal remedy"); and (4) several academic articles that purportedly identify a handful of judicial decisions (all issued by foreign courts) authorizing the execution of judgment against a foreign sovereign's real property, *see, e.g.*, Charles Fairman, *Some Disputed Applications of the Principle of State Immunity*, 22 AM. J. INT'L L. 566, 567 (1928); Note, *Execution of Judgments Against the Property of Foreign States*, 44 HARV. L. REV. 963, 965 (1931). In our view, these sources fall far short of establishing that the immovable property exception under common law should be understood to permit tax foreclosure actions against a foreign sovereign's property.

[10] As we noted above, when describing the common law exception to sovereign immunity for immovable property, courts have generally looked to the Restatement (Second) of Foreign Relations Law. *See, e.g.*, *Permanent Mission of India II*, 551 U.S. at 200; *Permanent Mission of India I*, 446 F.3d at 372. This is because the Restatement (Second) predates the enactment of the FSIA, whereas more recent editions of the Restatement postdate the statute and so naturally focus on the FSIA's articulation of a statutory immovable-property exception to foreign sovereign

against a foreign state," the "[s]uccessful plaintiffs [would have] to rely on voluntary payment by the foreign state" to obtain satisfaction of judgment because the foreign sovereign's property remains shielded from attachment, arrest, or execution. *Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 476-77 (7th Cir. 2016), *aff'd*, 138 S. Ct. 816 (2018); *see also Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen*, 43 F.2d 705, 708 (2d Cir. 1930) ("The clear weight of authority in this country, as well as that of England and Continental Europe, is against all seizures [of a foreign sovereign's property], even though a valid judgment has been entered.").

Nothing in the longstanding case law, moreover, suggests that this common law rule of "complete immunity from execution" recognized an exception for immovable property. *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 251 (5th Cir. 2002); *see also Stephens*, 69 F.3d at 1233 (observing that "[t]he only exception to this rule was that attachment could sometimes be allowed in order to obtain jurisdiction over the foreign entity"). In line with this view, we observe that Congress apparently did not conceive that such a limitation already existed when, as part of the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), it created a series of statutory "[e]xceptions to the immunity from attachment or execution"—including, most notably, an immovable-property exception. 28 U.S.C. § 1610; *see also id.* § 1610(a)(4) (generally abrogating immunity from execution where "the execution relates to a judgment establishing rights in property . . . (B) which is immovable and situated in the United States"). As evidenced by the FSIA House Report, Congress saw these statutory exceptions as deviations from the common law rule of "absolut[e] immun[ity] from execution." H.R. Rep. 94-1487, 27 (1976), *reprinted at* 1976 U.S.C.C.A.N. 6604, 6626; *see also Permanent Mission of India I*, 446 F.3d at 371 (describing the FSIA House Report as "reliable

immunity. In any event, we do not see anything in the Restatement (Third) or Restatement (Fourth) of Foreign Relations Law that casts doubt on the analysis offered here.

legislative history"). The Report explains, in particular, that "[s]ections 1610(a) and (b)" of the FSIA—which set forth all of the FSIA's exceptions to immunity from execution—were "intended to modify this rule by partially lowering the barrier of immunity from execution." 1976 U.S.C.C.A.N. at 6626.

A foreclosure action under Article 11 differs in no meaningful way from an execution of judgment against property. Just as execution or attachment enforces a money judgment by seizing the debtor's property, the Foreclosure Actions seek a court order awarding Seneca County title to the Properties as satisfaction for the Cayugas' acknowledged money debt. *See Execution*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "execution" as the "[j]udicial enforcement of a money judgment, usu[ally] by seizing and selling the judgment debtor's property"); *Attachment*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "attachment" as "[t]he seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment"). The County's tax enforcement proceedings therefore fall comfortably within the absolute immunity from execution of judgment that foreign sovereigns traditionally enjoyed at common law.

For all these reasons, we conclude that the common law exception to sovereign immunity for lawsuits concerning immovable property does not cover the Foreclosure Actions. Accordingly, we need not—and do not—decide whether an analogous exception limits the scope of tribal sovereign immunity from suit.

## II. *Sherrill's* Import

Seneca County also urges us to overturn the District Court's judgment based on the Supreme Court's decision in *Sherrill*. In the County's view, the *Sherrill* Court held that a tribe's immunity from suit does not bar tax enforcement actions seeking to foreclose on lands purchased by the tribe on the open market.

18

We have already rejected this reading of *Sherrill* on two separate occasions: first in *Oneida I*, 605 F.3d at 156-59, and next in *Cayuga I*, 761 F.3d at 221. Although for reasons we discussed above neither decision controls our analysis as a matter of precedent, we agree with those panels' analyses and, for the reasons set forth below, echo their conclusion that *Sherrill* does not strip tribes of their immunity from suit in tax foreclosure proceedings.

*Sherrill* concerned the taxation of parcels of land located in the City of Sherrill, New York ("the City"), that once were part of the historic reservation of the Oneida Indian Nation (the "Oneidas" or the "Oneida Nation"). *See* 544 U.S. at 202. The Oneidas reportedly sold these parcels to "a non-Indian in 1807," but later, in the 1990's, the tribe repurchased them on the open market. *Id.* at 211. When the Oneida Nation then refused to pay property taxes on those lands to the City, the City initiated eviction proceedings in state court. *See id.* In response, the Oneidas filed a federal lawsuit seeking "equitable relief prohibiting, currently and in the future, the [City's] imposition of property taxes" on the lands. *Id.* at 211-12. The tribe pressed the position that its "acquisition of fee title to discrete parcels of historic reservation land revived [its] . . . ancient sovereignty piecemeal over each parcel." *Id.* at 202.

The Supreme Court rejected the Oneidas' claim of immunity from taxation. The tribe's newly purchased properties "had been subject to state and local taxation for generations," the Court observed. *Id.* at 214. Invoking the doctrines of "laches, acquiescence, and impossibility," *id.* at 221, it reasoned that the tribe should not be permitted to "rekindl[e] embers of sovereignty that long ago grew cold," *id.* at 214. Thus, the Court concluded, the Oneidas could not "resist[] the payment of property taxes to Sherrill" on the ground that the disputed properties were not subject to the City's "regulatory authority." *Id.* at 202.

As we explained in *Oneida I* and later affirmed in *Cayuga I*, the Court's holding in *Sherrill* pertains to a tribe's immunity from taxation—*e.g.*, whether a state or local authority has the power to *impose* real property taxes on tribal lands. *See Oneida I*, 605 F.3d at 159; *Cayuga I*, 761 F.3d at 221. It does not, however, speak to a tribe's immunity from suit—*e.g.*, whether a state may use the courts against a tribe to *collect* taxes levied against tribal lands. *See Oneida I*, 605 F.3d at 159; *Cayuga I*, 761 F.3d at 221. These two types of immunities are "separate and independent," we emphasized, each defined by a "distinctive history" in the case law. *Oneida I*, 605 F.3d at 158. Tribal immunity from the imposition of taxes, for example, is "closely tied to the question of whether the specific parcel at issue is Indian reservation land." *Id.* at 157 (quoting *Cass Cty. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 110 (1998)). In contrast, "a tribe's immunity from suit is independent of its lands." *Id.* (citing *Kiowa Tribe of Okla. v. Mfg. Tech., Inc.*, 523 U.S. 751, 754 (1998)). We therefore concluded that *Sherrill* did not abrogate the Oneidas' immunity from a suit to collect taxes by simply recognizing the City's authority to impose taxes on the tribe's non-reservation properties. *See id.* at 159. Instead, we observed "a difference between the right to demand compliance with state laws" (which *Sherrill* addressed) and "the means available to enforce [those laws]" (which *Sherrill* did not consider). *Id.* at 158 (quoting *Kiowa*, 523 U.S. at 755).

We see no reason today to depart from this understanding of *Sherrill*'s scope and import. In support of its reading that *Sherrill* eliminated the Oneidas' immunity from suit in tax foreclosure actions, Seneca County points to a footnote in the *Sherrill* majority opinion assailing the dissent's "suggest[ion] that, compatibly with [the majority] decision, the Tribe may assert tax immunity defensively in the eviction proceeding." *Sherrill*, 544 U.S. at 214 n.7. We agree with the Cayuga Nation, however, that the Court's reference to "tax immunity" in footnote 7 concerns the Oneidas' immunity from taxation, not its immunity from suit to enforce a tax liability. We doubt, moreover, that

20

the Supreme Court would choose to effect such a significant curtailment of tribal immunity from suit using ambiguous language relegated to a footnote. Such an approach would run directly counter to the Court's admonition against "carving out exceptions" to tribal immunity from suit and its longstanding practice of "defer[ring] to Congress about whether to abrogate [that] immunity." *Bay Mills*, 572 U.S. at 790.

Nor are we free to alter this legal analysis based on Seneca County's dark predictions that, if we affirm the District Court's ruling, tribes will "buy large swaths of property within the County," and the County, in turn, will be left remediless if and when those tribes refuse to pay property taxes. Appellant's Br. 37. As we explained in *Oneida I*, 605 F.3d at 159-60, the Supreme Court has already rejected a similar line of argument in *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 514 (1991) ("*Potawatomi*"). There, the Court held that while Oklahoma could tax certain cigarette sales made at the tribe's convenience store, the tribe's immunity from suit precluded the State from suing to collect unpaid taxes. *Potawatomi*, 498 U.S. at 512, 514. In reaching this conclusion, the Court acknowledged that tribal immunity from suit "bar[red] the State from pursuing the most efficient remedy." *Id.* at 514. It resisted, however, Oklahoma's claim that the state "lack[ed] any adequate alternatives." *Id.* The Court pointed out that the State could, among other things, enter into an agreement with the tribe "to adopt a mutually satisfactory regime for the collection of this sort of tax." *Id.* And if that failed, the Court continued, Oklahoma could "of course seek appropriate legislation from Congress." *Id.*

Because those same alternatives are available to Seneca County with respect to the real property taxes at issue here, we will not assume that the County's right to tax the Properties presumes the right to use Article 11 foreclosure proceedings to collect those taxes. *Cf. McGirt*, 140 S. Ct. at 2481 (observing that Oklahoma's "dire warnings" about the consequences of recognizing certain lands within that State as reservation

21

lands are "not a license for us to disregard the law"). Instead, we adhere to the settled principle that "it is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity." *Bay Mills*, 572 U.S. at 800. We therefore conclude—as we did in *Oneida I* and *Cayuga I*—that "[t]he remedy of foreclosure" is unavailable to the County by virtue of the Tribe's immunity from suit. *Oneida I*, 605 F.3d at 151.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the District Court.

22